FARMLAND DAIRIES, Fairdale Dairies, Inc. and Fairlawn Dairies, Inc., Plaintiffs,

v.

Richard T. McGUIRE, as Commissioner of the New York State Department of Agriculture and Markets, Defendant.

LEHIGH VALLEY DAIRIES, INC., Johanna Farms, Inc., Johnstown Sani–Dairy, a Division of Penn Traffic Co., and Tuscan Dairy Farms, Inc., Plaintiffs,

v.

Richard T. McGUIRE, as Commissioner of the New York State Department of Agriculture and Markets, Defendant.

Nos. 91 Civ. 3642 (RPP), 91 Civ. 4574 (RPP).

United States District Court, S.D. New York.

April 14, 1992.

Friedman, Wittenstein & Hochman, by Andrew A. Wittenstein, Stuart I. Friedman, New York City, for plaintiffs Farmland Dairies, et al.

Gross, McGinley, LaBarre & Eaton by J. Jackson Eaton, III, Allentown, Pa., Richard Turyn, New York City, for plaintiffs Lehigh Valley, et al.

Robert Abrams, Atty. Gen., State of N.Y. by Barrie L. Goldstein, Dept. of Law, New York City, Joan A. Kehoe by Michael McCormick, Dept. of Agr. and Markets of State of N.Y., Albany, N.Y., for defendant.

**ROBERT P. PATTERSON, Jr.,** District Judge.

Plaintiffs bring these actions for declaratory and injunctive relief under 42 U.S.C. § 1983 and the Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3. Plaintiffs also seek an award of attorneys fees, pursuant to 42 U.S.C. § 1988, and costs. Plaintiffs, milk dealers who are licensed to sell milk in New York and whose milk processing plants are located out of state, challenge New York's implementation of 1991 N.Y.Laws ch. 84. That statute provides for the establishment of interim minimum prices for milk produced in New York and for the establishment of compensatory payment mechanisms to equalize the costs to dealers of supplying Class I milk in New York. Both complaints aver that the portion of the statute requiring compensatory payments, and its implementation pursuant to orders of the Commissioner of the New York State Department Agriculture and Markets ("the Commissioner"), violate the Commerce Clause. Plaintiff Tuscan Dairy Farms, Inc. also alleges that New York's requirement that it pay the New York minimum price for New York milk it purchases F.O.B. its New Jersey plant violates the Commerce Clause. Defendant has filed counterclaims alleging that Plaintiffs owe, and have not paid, compensatory payments under the Commissioner's orders and requesting a money judgment in an amount equal to Plaintiffs' alleged obligations, with interest. Plaintiffs have moved for summary judgment. For the reasons set forth

below, Plaintiffs' motions are granted in part denied in part, and Defendant's counterclaims as to the compensatory payments are dismissed.

## BACKGROUND

### 1. The Parties

Defendant Richard T. McGuire is the Commissioner of the New York State Department of Agriculture and Markets (the "Department").[1] The Department is the state administrative agency that, *inter alia*, is charged with the regulation of the milk industry in New York.

Plaintiff Farmland Dairies is a milk processing company. Plaintiffs Fairdale, Inc. and Fairlawn Dairies, Inc. are wholly owned subsidiaries of Farmland Dairies. (The three companies are referred to herein collectively as "Farmland.") Farmland Dairies and Fairlawn are incorporated in New Jersey, and Fairdale is incorporated in Pennsylvania. All three companies have their principal place of business in Wallington, New Jersey. Fairdale purchases raw milk from dairy farmers in New York, New Jersey, and Pennsylvania. Farmland Dairies processes milk at its plant in New Jersey, and both Farmland Dairies and Fairlawn sell the finished products to retail outlets on the east coast of the United States, including in the state of New York. The Commissioner has required that Farmland make compensatory payments to an equalization fund established by the Commissioner ("the Equalization Fund") with respect to Farmland's non-New York Class I milk distributed and sold in New York.[2] Goldman Aff. ¶¶ 2–4.

Plaintiff Lehigh Valley Dairies, Inc. ("Lehigh Valley") operates a milk processing plant in Schuylkill Haven, Pennsylvania. It purchases raw milk at its Schuylkill Haven plant from non-New York farmers. It has been shipping milk for Class I distribution into New York State since 1984. The Commissioner has required that Lehigh make compensatory payments to the Equalization Fund for Lehigh Valley's non-New York Class I milk shipped into New York. Cowan Aff. ¶¶ 2–5.

Plaintiff Johnstown Sani–Dairy ("Johnstown") operates a milk processing plant in Johnstown, Pennsylvania. It purchases raw milk at its Johnstown plant from non-New York farmers. It has been shipping milk for Class I distribution into New York State since 1986. The Commissioner has required that Johnstown make compensatory payments to the Equalization Fund for Johnstown's non-New York Class I milk shipped into New York. Wagner Aff. ¶¶ 2–5.

Plaintiff Johanna Farms, Inc. ("Johanna") operates a milk processing plant in Flemington, New Jersey. Johanna purchases raw milk from non-New York farmers. Johanna periodically sells a portion of this raw milk to other milk dealers and ships it to plants operated by these dealers in New York State. The Commissioner has required that dealers purchasing Johanna's raw milk make compensatory payments to the Equalization Fund for Johanna's non-New York Class I milk shipped into New York. Burns Aff. ¶¶ 2–5.

Plaintiff Tuscan Dairy Farms, Inc. ("Tuscan") operates a milk processing plant in Union, New Jersey. It purchases milk from farmers located in Pennsylvania, New Jersey, and New York and has been shipping milk for Class I purposes into New York State since 1987. Pursuant to a contract that has been in effect since 1978, Tuscan purchases some milk originating on New York farms from Dairylea, Inc., a farmers' cooperative, F.O.B. Tuscan's plant in New Jersey. The Commissioner has required that Tuscan pay to Dairylea the New York State minimum price for the New York milk purchased in New Jersey.

---

1. Appearing as amicus curiae are Stephen H. Taylor, Commissioner of Agriculture of New Hampshire, Peter W. Curra, Acting Commissioner of the Maine Milk Commission, Carl W. Flora, Deputy Commissioner of Agriculture of Maine, John M. McHugh, Chairman, New York Joint Legislative Commission on the Dairy Industry, and The Regional Cooperative Marketing Agency, Inc.

2. New York State's Equalization Fund and method for calculating compensatory payments is discussed *infra*.

The Commissioner has also required that Tuscan make compensatory payments to the Equalization Fund for the non-New York Class I milk shipped by Tuscan or its customers (independent distributors) into New York. Demeter Aff. ¶¶ 2–5, 7–8.

### 2. The Federal Milk Regulatory System

Since 1937, the handling of milk has been extensively regulated by the federal government pursuant to 7 U.S.C. § 608c and the regulations promulgated thereunder, 7 C.F.R. ch. X. Pursuant to § 608c, the United States Secretary of Agriculture has designated milk marketing areas in which regulations establish orderly marketing conditions and minimum prices for milk purchased from dairy farmers in each area. Each such milk marketing area is governed by a separate federal order. The relevant milk marketing area in this case, the New York–New Jersey Marketing Area, is governed by Federal Order 2. 7 C.F.R. pt. 1002.

Federal milk marketing orders classify milk according to the form in which or purpose for which it is used. 7 U.S.C. § 608c(5)(A). Most federal milk marketing orders, including Federal Order 2, divide milk into three classes: Class I primarily includes beverage milk, Class II includes fluid cream items and soft milk products such as yogurt and cottage cheese, and Class III includes hard milk products, such as butter and hard cheese. 56 Fed.Reg. 5308 (1992) (amending 7 C.F.R. § 1002.41). Each class is assigned a specific minimum price, with Class I having the highest, Class II the intermediate, and Class III the lowest price.

The Federal Order 2 regulations governing the pricing of milk and the payments to be made for milk are complex, but essentially operate as follows. Milk pricing within the New York–New Jersey Marketing Area is performed by the federal market administrator, who computes a "Uniform Price," which is a weighted average price based on total sales of Class I, Class II, and Class III milk. 7 C.F.R. § 1002.71. Dealers are required to pay at least the Uniform Price to farmers. If a dealer sells milk for Class I purposes, the dealer is required to pay into a "Producer Settlement Fund" the difference between the Uniform Price paid to the farmer and the higher Class I established minimum price. If the dealer sells milk for Class II or Class III purposes, the dealer receives a reimbursement or credit from the Producer Settlement Fund equal to the difference between the Uniform Price paid to farmers and the lower Class II and Class III established minimum prices. Whether the dealer receives a reimbursement or makes a payment depends on the net differential between the two computations. Thus, all farmers providing milk in a federal market area receive the Uniform Price for their milk, while each dealer, by virtue of payments to or receipts from the Producer Settlement Fund, incurs net costs equal to the total assigned class prices in the market area of the Class I, Class II, and Class III milk that the dealer purchases.

### 3. The New York Milk Regulatory System[3]

The dairy industry is also regulated within New York State under provisions of the New York State Agriculture and Markets Law ("the Rogers–Allen Act" or "the Act"), enacted in 1937. N.Y.Agric. & Mkts.Law §§ 258–k to 258–n (McKinney 1991). Section 258–m of the Act grants the Commissioner, upon petition of dairy farmers, the authority to establish marketing orders within New York following a public hearing. Id. § 258–m(1). The petition is presented by a farmers' bargaining agency that represents at least thirty-five percent of the dairy farmers in the market area. Id. If after the hearing the Commissioner finds that conditions in the market require the setting of prices, and if it is favored by at least sixty-six and two-thirds percent of the dairy farmers in the market area, the Commissioner may by order fix and deter-

---

**3.** The Rogers–Allen Act and the orders of the Commissioner at issue here are inconsistently described in the motion papers. Accordingly, the Court has relied on the text of the orders and regulations themselves for these findings.

mine for the marketing area fair and equitable minimum prices to be paid to dairy farmers.[4] *Id.*

On February 13, 1991, the Regional Co-operative Bargaining Agency ("RCBA"), an association of dairy farmers and dairy cooperatives, petitioned the Commissioner pursuant to the Rogers–Allen Act, requesting a hearing to consider the adoption of a statewide milk marketing order that would establish minimum prices for Class I, Class II, and Class III milk sold by New York dairy farmers above the minimum prices established by then existing federal and state milk marketing orders. The Commissioner granted the RCBA's request and scheduled a hearing.

On May 1, 1991, while the hearing was in process, the New York Legislature enacted a change to the Rogers–Allen Act, amending the procedure for the determination of state-established minimum producer milk prices ("the amendment"). The Legislature found that "the continued production of milk in the state is threatened by a rapid decline in the prices paid to farmers for milk [and that this] substantial decrease in farm price has not been reflected in reduced costs to consumers." 1991 N.Y.Laws ch. 84, § 1. Declaring that "an emergency exists at the present time which requires the adoption of urgent measures" and that "the time required to complete the process set out in § 258–m of the agriculture and markets law is excessive to meet the legitimate needs of the parties to this process," the Legislature sought to expedite that process. *Id.* Accordingly, the amendment requires the Commissioner to set, without a hearing, an interim price for Class I milk purchased from New York farmers within five days of the receipt of a petition, to remain in effect for no longer than 180 days. *Id.* § 2. Additionally, the Commissioner is required to "provide for and enforce a mechanism for compensatory payments" and may establish and administer an equalization pool throughout the entire state or any part thereof. *Id.*

Eight days later on May 9, 1991, pursuant to the Rogers–Allen Act amendment, the Commissioner issued an interim price determination and order establishing a minimum price of $13.85 per hundredweight for New York-produced class I fluid milk, to apply to milk sold by New York dairy farmers on or after June 1, 1991. Interim Price Determination and Order of May 9, 1991 (Newcomb Aff. in Opp.Exh. B) (hereinafter cited as "May 9, 1991 Interim Order"). This price was higher than the minimum Federal Order 2 price for Class I fluid milk, which was $12.46 per hundredweight for the month of June 1991. Lehigh Valley Mem. in Supp. at 10. The May 9 order required every licensed milk dealer purchasing New York-produced milk to pay at least the minimum prices set forth in the order. It also stated that "[a]ll milk produced outside New York State and distributed within the State as Class I fluid milk shall be subject to the application of a compensatory payment as the Commissioner determines necessary to equalize cost for such milk among licensed milk dealers.... Such prices shall be paid and payments made in accordance with the regulations promulgated by the Commissioner." *Id.*

Two weeks later, on May 23, 1991, the Commissioner adopted a comprehensive interim milk pricing order, codified at N.Y.Comp.Codes R. & Regs. tit. 1, pt. 22 (1991) ("Part 22"), which provided for operation of an Equalization Fund and established a compensatory payments system. The Part 22 regulations established a method for the classification and pricing of milk, *id.* §§ 22.30–22.42, and for determining payments to be made by dealers, *id.* §§ 22.-50–22.67.

Stated in simplified form, the system, which in essence paralleled the federal system, operated as follows. In addition to the milk price received under the federal system, New York dairy farmers received an additional premium, the "Over Order Rate," calculated in a manner analogous to

---

**4.** For a number of years, the Commissioner has been setting minimum prices applicable only to New York-produced milk. *See, e.g., Noyes v.*

*Erie & Wyoming Farmers Co-op. Corp.,* 281 N.Y. 187, 22 N.E.2d 334 (1939).

the Federal Order 2 Uniform Price but consisting of a weighted average of the New York "premiums" for Class I, II, and III milk over the federal prices.[5] *Id.* §§ 22.50–22.51, 22.60.

Each month, dealers purchasing milk from New York dairy farmers were required to calculate their total "Net Pool Obligation," an amount equal to the total premiums for all classes of New York milk sold by each dealer, *i.e.*, the difference between the total price of the dealer's milk under the Federal Order 2 milk class prices and the total price under the higher milk class prices established by the New York regulation. If a dealer's Net Pool Obligation exceeded the dealer's total Over Order Rate payments (*i.e.*, total payments less federal Uniform Price payments) to New York dairy farmers, for example because the dealer sold primarily Class I milk, the dealer would pay the difference to the Equalization Fund. *Id.* § 22.64. If the Net Pool Obligation was less than the total Over Order Rate payments, the dealer would receive that difference from the Equalization Fund.[6] *Id.* § 22.65.

Also under Part 22, effective June 1, 1991, dealers selling non-New York-produced milk for Class I use in New York State were required to calculate their Net Pool Obligation for such non-New York Class I milk as if they had purchased the milk from New York dairy farmers. In determining the amount of their payments into the Equalization Fund, such dealers were required to deduct from their Net Pool Obligation for Class I milk either (a) an amount equal to the total quantity of non-New York Class I milk sold in New York times the Over Order Rate or (b) the average amount by which total payments to out-of-state farmers exceeded the payments required under the "Milk Marketing Order" where the non-New York milk was pooled. *Id.* § 22.66. Thus, dealers of Class I non-New York milk were required to pay into the Equalization Fund the difference between their Net Pool Obligation and either of the foregoing amounts calculated.[7]

On June 26, 1991, the Commissioner issued a decision and notice of referendum based upon the testimony and evidence received at the hearing concerning the RCBA proposal. The Commissioner found that "extreme fluctuations" in milk prices received by New York dairy farmers had rendered these farmers "unable to adjust their operations in an orderly fashion to meet changing market conditions." He stated that the "severity of these fluctuations imperils the existence of many New York farms, which is not in the public interest." Decision and Notice of Referendum, June 26, 1991, at 6 (Newcomb Aff. Exh. E). The Commissioner recommended that the RCBA proposal be adopted, as revised based upon testimony and evidence received at the hearing, "to promote the orderly marketing of milk to maintain the State's dairy industry and protect consumers by ensuring dairy farmers a minimum price sufficient to maintain an adequate supply of reasonably priced milk for New York consumers."[8] *Id.* at 7.

---

5. To calculate the Over Order Rate, the Commissioner totaled all Net Pool Obligations (*see infra*) calculated by dealers selling both New York and non-New York milk. To this total was added any unreserved cash in the Equalization Fund. The resulting amount was then divided by the total hundredweight of "pool" (New York-produced) milk only. The Over Order Rate thus increased proportionately with the amount of non-New York Class I milk sold in New York.

6. Monthly balances in the Equalization Fund evidently varied, so that there were not always sufficient funds to pay the amounts dealers were supposed to receive from the Equalization Fund; in such circumstances, pro rata distribution was utilized.

7. Net Pool Obligations were calculated only for Class I non-New York milk. Thus, Net Pool Obligations of dealers selling only non-New York milk were never less than the value of their milk calculated at one of the foregoing rates. Such dealers were therefore never eligible for payments out of the Equalization Fund.

8. No support is provided for these conclusory findings set forth by the Commissioner, and thus the Court is not making findings that the reasons set forth are well-founded in fact. *Cf. Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 522–24, 55 S.Ct. 497, 500–01, 79 L.Ed. 1032 (1935).

A producer referendum was conducted in July 1991, and the proposed marketing order was approved by sixty-eight and one half percent of farmers eligible to vote. Final Determination, July 11, 1991, at 2 (Newcomb Aff.Exh. F). The Commissioner thereafter adopted the Emergency Order proposed by the RCBA, as amended at the hearing, as N.Y.Comp.Codes R. & Regs. tit. 1, pt. 23 (1991) ("Part 23"), to take effect August 1, 1991. Promulgation, July 16, 1991 (Newcomb Aff.Exh. G). Part 23 established a minimum price of $14.50 per hundredweight for Class I milk but did not provide for compensatory payments. Concurrently, the interim order, Part 22, was repealed effective August 1, 1991. Promulgation, July 19, 1991 (Newcomb Aff. Exh. G).

Prior to August 1, 1991, on July 19, the RCBA filed with the Commissioner a new petition seeking amendment of Part 23. Pursuant to Chapter 84, on July 26, 1991, the Commissioner issued a second Interim Price Determination and Order establishing a New York interim price of $14.50 for milk used for Class I purposes, to be applied to "every licensed milk dealer purchasing New York produced milk," and reinstating a compensatory payment mechanism, to be administered in accordance with regulations to be promulgated by the Commissioner. Interim Price Determination and Order, July 26, 1991 (Newcomb Aff.Exh. H). Part 23 was amended to reflect these changes, including a compensatory payment mechanism applicable to dealers of non-New York milk similar to that provided for in Part 22. Promulgation, July 31, 1991 (Newcomb Aff.Exh. H). A hearing was held on August 20, 1991 to consider the amendments proposed by the RCBA. The Commissioner thereafter issued a decision proposing these amendments and provided for the conduct of a referendum. The pro-posed amended order was not approved by dairy farmers in the referendum. Accordingly, effective October 1, 1991 the second interim order expired, the Commissioner repealed Part 23, the Emergency Order, and Defendant has not required Plaintiffs to make compensatory payments to the Equalization Fund since that date.[9] Newcomb Aff. ¶ 22.

## DISCUSSION

Summary judgment is appropriate if the evidence offered demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Insofar as relief is granted on these motions, the Court has relied on the Rogers–Allen Act and the Commissioner's regulations themselves and not on any facts that are in dispute.[10]

1. Claims for Declaratory and Injunctive Relief

Plaintiffs in this case request the Court to "[e]nter a declaratory judgment that the Amendment to section 258–m of the New York Agriculture and Markets Law and the regulations promulgated thereunder violate the Commerce Clause ... [and] 42 U.S.C. § 1983 ... [and to i]ssue an order permanently enjoining the Commissioner from attempting in any way to collect the so-called 'compensatory payments' identified in [the amendment] and regulations promulgated thereunder." Farmland Complaint at 6, ¶¶ 1–3; Lehigh Valley Complaint at 10, ¶¶ 1–3. The Lehigh Valley complaint also requests that the Court "[i]ssue an order permanently enjoining the Commissioner from attempting in any way to fix the price to be paid for milk of New York producers

---

**9.** With the Emergency Order repealed, New York no longer has a compensatory payment requirement. The amendment to the Rogers–Allen Act remains, however, leaving the possibility that future, similar compensatory payment schemes will be established.

**10.** At oral argument, the Court raised the question of the standing of Plaintiff dealers in this case and permitted the parties to submit additional papers on this issue. Subsequently, counsel for Defendant Barrie Goldstein submitted a letter to the Court in which she stated that "[t]he State does not contest plaintiffs' standing to bring their lawsuits." Letter from Barrie Goldstein to Court of 11/22/91.

where the sale of such milk occurs out of New York State." Lehigh Valley Complaint at 10, ¶ 4.

■ A federal court may "[i]n a case of actual controversy within its jurisdiction ... declare the rights ... of any interested party seeking such a declaration." 28 U.S.C. § 2201. "A 'controversy' in this sense must be one that is appropriate for judicial determination.... A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." *Aetna life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted). Defendant alleges that Plaintiffs owe, and have not paid, compensatory payments under Parts 22 and 23. Def.Ans. & Counterclaims to Farmland Complaint ¶¶ 34–35; Def.Amended Ans. & Counterclaims to Lehigh Valley Complaint ¶¶ 33–34. Defendant has counterclaimed for a money judgment in an amount equal to Plaintiffs' alleged "equalization and compensatory payment obligations together with interest thereon." *Id.* Plaintiffs claim that they "are not obligated to make any compensatory payments pursuant to [the Rogers–Allen Act amendment] and the regulations promulgated thereunder because such statute and regulations are unconstitutional." Farmland Reply to Counterclaims ¶ 26; *see* Lehigh Valley Reply to Amended Ans. & Counterclaims at 3. Accordingly, Plaintiffs' claims present an "actual controversy" within the meaning of the Declaratory Judgment Act.

■ An injunction can be issued only to prevent existing or presently threatened injuries. *Socialist Workers Party v. Attorney Gen. of the United States*, 642 F.Supp. 1357, 1425 (S.D.N.Y.1986). To obtain injunctive relief based on past injury, the plaintiff must show a real and immediate threat that the injury will be continued or repeated. *Id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). "In the context of a suit in which plaintiff seeks permanent injunctive relief from a constitutional violation, the court should first consider wheth-

er plaintiff has established the fact of a violation." *Rosenberg v. Meese*, 622 F.Supp. 1451, 1476 (S.D.N.Y.1985) (citing *Rizzo v. Goode*, 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976)). Second, if the plaintiff has proved a constitutional violation, the court should consider whether plaintiff has demonstrated both the presence of a continuing irreparable injury and the lack of an adequate remedy at law. *Id.* (citing *Newman v. State of Alabama*, 683 F.2d 1312, 1319 (11th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983)). As discussed below, Plaintiffs have not shown that injunctive relief is warranted in this case.

### 2. Commerce Clause

■ The Commerce Clause of the United States Constitution " 'prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " *Wyoming v. Oklahoma*, —— U.S. ——, ——, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992) (quoting *New Energy Co. v. Limbach*, 486 U.S. 269, 273–74, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988)). The United States Supreme Court has established a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce or when its effect is to favor in-state economic interests over out-of-state interests, the Supreme Court generally has struck down the statute without further inquiry. *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578–79, 106 S.Ct. 2080, 2083–84, 90 L.Ed.2d 552 (1986) (citing *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Shafer v. Farmers' Grain Co.*, 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909 (1925)). Such regulations are "virtually *per se* invalid" under the Commerce Clause, *id.* 476 U.S. at 579, 106 S.Ct. at 2084, and the burden then falls upon the state to justify the statute in terms of the local benefits flowing from the statute and the lack of nondiscriminatory alternatives adequate to preserve the local interests at stake. *Wyoming*, 112

S.Ct. at 801. When a statute has only indirect effects on interstate commerce and regulates evenhandedly, the Court has examined whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). In either situation, the critical consideration is the overall effect of the statute on both local and interstate activity. *Id.*

### 3. Compensatory Payments

#### a. Commerce Clause

The Supreme Court has affirmed the right of a state to fix minimum prices for milk produced and sold by dairy farmers within that state's borders. *See Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 378, 84 S.Ct. 378, 388, 11 L.Ed.2d 389 (1964) (citing *Milk Control Bd. v. Eisenberg Farm Prods.*, 306 U.S. 346, 351, 59 S.Ct. 528, 530, 83 L.Ed. 752 (1939)); *H.P. Hood & Sons v. Du Mond*, 336 U.S. 525, 530, 567, 69 S.Ct. 657, 661, 670, 93 L.Ed. 865 (1949). Plaintiffs do not challenge New York's establishment of a minimum price for New York-produced milk exceeding the Federal Order minimum price, applicable to farmers' sales of milk occurring within New York. Plaintiffs' objection is to the requirement that dealers of non-New York milk make compensatory payments for Class I milk purchased at a lower price from dairy farmers outside of New York State if such milk is sold in New York. Essentially, Plaintiffs argue that the regulations are *per se* invalid under the Commerce Clause, because the compensatory payment requirement amounts to unconstitutional discrimination against interstate commerce. Plaintiffs assert that the major purpose of the compensatory payment requirement is to protect the New York dairy industry and to cancel out the economic advantage that lower-priced non-New York

milk would otherwise have over New York-produced milk.

The compensatory payment mechanisms in Parts 22 and 23 (as amended),[11] discussed *supra*, have the appearance of treating dealers of New York milk and dealers of non-New York milk equally. *Compare Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937) (Washington use tax, in conjunction with local sales tax, did not discriminate against interstate commerce where equal burden was placed on "stranger from afar" and "dweller within the gates") *with Wyoming v. Oklahoma*, 112 S.Ct. at 800–01 (Oklahoma statute "expressly reserve[d] a segment of the Oklahoma coal market for Oklahoma-mined coal, to the exclusion of coal mined in other States" and thus discriminated "both on its face and in practical effect"). Here, Parts 22 and 23 of the New York Regulations required payments to the Equalization Fund by all dealers selling Class I milk in New York, and both regulations took into account any premiums paid for non-New York milk and reduced the compensatory payments accordingly.

Adopting this view of the regulations, Defendant argues that Parts 22 and 23 are valid under *Henneford*, in which the Supreme Court found constitutional a compensating use tax established by the State of Washington on property acquired by retail purchase in or from another state and brought into Washington. The use tax in *Henneford* was in the same amount is the Washington State sales tax, and credit was given for any sales or use tax already paid. *See* 300 U.S. at 583–84, 57 S.Ct. at 527–28. The Supreme Court acknowledged that "[o]ne of [the effects of the use tax] must be that retail sellers in Washington will be helped to compete upon terms of equality with retail dealers in other states who are exempt from a sales tax or any corresponding burden." *Id.* at 581, 57 S.Ct. at 526. The Court found, however, that the use tax was not a tax upon the operations of interstate commerce or an unlawful discrimina-

---

**11.** Hereafter, all references to "Part 23" are to the amended version, which included a compensatory payment requirement.

tion against such commerce because, rather than creating a preference for Washington goods, the use tax was aimed at achieving equality. *Id.* at 581, 586, 57 S.Ct. at 526, 528.

■ *Henneford* did not alter the rule that a statute is unconstitutional under the *per se* test of the Commerce Clause analysis if "its effect is to favor in-state interests over out-of-state interests." *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. at 2084. Defendant contends that the compensatory payment mechanism, like the compensating use tax at issue in *Henneford,* "seek[s] to insure merely that the playing field is level." Def.Mem. in Opp. at 13 (footnotes omitted). According to the Commissioner, however, the regulations were promulgated precisely because New York dairy farmers could not survive on a level playing field. *See, e.g.,* May 9 Interim Order at 4 (Newcomb Aff.Exh. B) ("Milk prices that now prevail in New York are not sufficient for dairy farmers to meet loan payments, cost of production and to maintain dairy operations.") The Commissioner thus permissibly set a higher price for the purchase of milk from New York farmers. *See Eisenberg Farm Prods.,* 306 U.S. at 351, 59 S.Ct. at 530.

Noting the possibility of a concomitant reduction in the distribution of New York milk for Class I use, the Commissioner then impermissibly sought to bolster the effectiveness of the minimum prices in a manner that burdened interstate commerce. In his Order adopting the RCBA's proposal to amend Part 23 to apply the interim price to milk produced within but sold and distributed outside New York and to reinstate a compensatory payment mechanism, the Commissioner listed the factors taken into consideration in adopting the amendments. In addressing "The Interest of the General Public," the Commissioner noted the RCBA's claim "that the absence of such provisions has and will result in disorderly marketing conditions including a decrease in the utilization of Class I milk produced in New York and a lower uniform price for New York produced milk." Inter-

im Price Determination and Order, July 26, 1991, at 3 (Newcomb Aff.Exh. H). "Such a result," he added, "would be against the interest of New York's dairy interest and of the general public." *Id.*

Specifically, the compensatory payment mechanisms in Parts 22 and 23 favored in-state interests over out-of-state interests by linking the compensatory payments required from dealers of non-New York milk to the receipt of the Over Order Rate by the New York dairy farmers. In *Henneford,* revenues from Washington State's sales tax and the compensatory use tax went to the general coffers of the state, not to the Washington retailers. The imposition of the use tax did not benefit Washington retailers affirmatively, but rather removed the disadvantage caused by the sales tax. Thus, as the Court there found, the compensatory tax merely equalized the burdens on in-state and out-of-state retailers.

Here, the total Net Pool Obligations of all dealers, including those who sold non-New York Class I milk, were used in the calculation of the Over Order Rate, the rate paid directly to New York farmers for their milk. Furthermore, the Over Order Rate was obtained by dividing the total Net Pool Obligations of all dealers, including dealers of non-New York Class I milk, by the "total hundredweight of *pool milk* received from producers by all dealers," N.Y.Comp.Codes R. & Regs. tit. 1, § 22.51 (1991) (emphasis added), rather than by the total quantity of milk accounted for in the Net Pool Obligations, which included Net Pool Obligations of dealers selling non-New York Class I milk.[12] The Over Order Rate paid to producers, thus increased proportionately with the amount of Class I non-New York milk sold in New York. In sum, the payments from dealers of non-New York milk did more than simply level the playing field: New York farmers received a higher price for their milk and were protected from suffering a corresponding reduction in sales; that protection necessarily came at the cost of out-of-state farmers with lower-priced milk, because the in-

---

**12.** "Pool milk" is defined as New York-produced milk. *See id.* §§ 22.8, 22.15(c).

centive to dealers to purchase such milk for distribution in New York was reduced or eliminated.

The New York Legislature enacted the Rogers–Allen Act amendment "to ensure that quality milk is available in the state," finding that "the continued production of milk in the state is threatened by a rapid decline in the prices paid to farmers for milk." In adopting Part 22, the Commissioner stated that the interim order would "promote market stability, reduce violent price fluctuations, and better ensure the availability of a quality milk supply throughout the State." [13] May 9, 1991 Interim Order (Newcomb Aff.Exh. B).

Under *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), and *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964), however, such a purported interest is not sufficient to overcome the corresponding burden imposed by the regulations upon interstate commerce. In *Baldwin*, the Supreme Court found unconstitutional a New York regulation that forbade New York-licensed dealers from selling out-of-state milk in New York unless the dealers had paid to the out-of-state farmers New York's minimum price for milk. The Court found that such an exercise of power by New York State impermissibly burdened interstate commerce. The purpose of the statute in *Baldwin* was asserted to be "the maintenance of a regular and adequate supply of pure and wholesome milk, the supply being put in jeopardy when the farmers of the state are unable to earn a living income." *Id.* 294 U.S. at 523, 55 S.Ct. at 500. The Court found that this purpose did not justify the burden imposed upon interstate commerce. Justice Cardozo, writing for the Court, stated:

> Nice distinctions have been made at times between direct and indirect burdens. They are irrelevant when the avowed purpose of the obstruction, as well as its necessary tendency, is to suppress or mitigate the consequences of competition between the states.... If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation.
>
> The argument has been pressed upon us, however, that the end to be served by the Milk Control Act is something more than the economic welfare of the farmers or of any other class or classes. The end to be served is the maintenance of a regular and adequate supply of pure and wholesome milk, the supply being put in jeopardy when the farmers of the state are unable to earn a living income. Price security, we are told, is only a special form of sanitary security; the economic motive is secondary and subordinate; the state intervenes to make its inhabitants healthy, and not to make them rich. On that assumption we are asked to say that intervention will be upheld as a valid exercise by the state of its internal police power, though there is an incidental obstruction to commerce between one state and another. This would be to eat up the rule under the guise of an exception. Economic welfare is always related to health, for there can be no health if men are starving. Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end of our national solidarity.

*Id.* at 522–23, 55 S.Ct. at 500.

The Supreme Court in *Polar Ice Cream* relied on *Baldwin* in finding unconstitu-

---

**13.** Despite Defendant's assertions to the contrary, Def.Mem. in Opp. at 13–14, it seems clear that Parts 22 and 23 were enacted to protect the New York dairy market, specifically New York dairy farmers. *See, e.g.*, 1991 N.Y.Laws ch. 84, § 1 (expressing need "to assist New York dairy farmers in this current crisis"); May 9 Interim Order (Newcomb Aff.Exh. B) (referring throughout to financial problems of New York dairy farmers). As discussed below, however, the regulations are unconstitutional even if solely intended to insure an adequate supply of milk to New York consumers.

tional a Florida statute that required milk dealers in the Pensacola milk marketing area to allocate a portion of their monthly sales in various classes of milk to designated Pensacola dairy farmers. 375 U.S. at 366, 84 S.Ct. at 381. The result of the statute was that all of the plaintiff distributor's Class I sales were required to be attributed to the designated Pensacola producers; only if these farmers did not fulfill the plaintiff's need for Class I milk could other milk be used for that purpose and thus command a premium price. *Id.* at 367, 84 S.Ct. at 381–82. In effect, the Court found, the statute preempted for Florida farmers a large share of Florida's most lucrative fluid milk market by prohibiting the purchase of out-of-state milk unless local production was inadequate. *See id.* at 376, 84 S.Ct. at 386–87. The Court concluded that, under *Baldwin,*

> [t]he exclusion of foreign milk from a major portion of the Florida market cannot be justified as an economic measure to protect the welfare of Florida dairy farmers or as a health measure designed to insure the existence of a wholesome supply of milk.... [T]he State may not, in the sole interest of promoting the economic welfare of its dairy farmers, insulate the Florida milk industry from competition from other States.

*Id.* at 377, 84 S.Ct. at 387; *see also Dean Milk Co. v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (relying on *Baldwin* in finding unconstitutional a Madison ordinance that prohibited, *inter alia,* sale of milk unless pasteurized at approved plant located within five miles of city center); *H.P. Hood & Sons,* 336 U.S. 525, 69 S.Ct. 657 (relying on *Baldwin* in finding unconstitutional a New York statute requiring the Commissioner to deny a dealer a license to buy New York milk if its issuance would "tend to a destructive competition in a market already adequately served").

The compensatory payment requirements set forth in Parts 22 and 23 are thus invalid under the Commerce Clause. Defendant has not met his burden of justifying the regulations either in terms of the local benefits flowing from the statute or by demonstrating that no nondiscriminatory alternatives exist.[14] *See Wyoming,* 112 S.Ct. at 801. There is no indication, however, in the parties' briefs or otherwise, that the Rogers–Allen Act, as amended, requires the establishment of the particular system promulgated by the Commissioner under Parts 22 and 23. The legislation does not support Plaintiffs' claim that "[a] 'mechanism for compensatory payments' means a regulatory scheme to require dealers purchasing milk out of state for distribution in New York at prices below the New York minimum to make a 'compensatory payment' to New York in such amount as to raise the cost of such handlers for milk to the cost of New York minimum." Lehigh Valley Complaint ¶ 19 (quoting Rogers–Allen Act amendment); *see also* Farmland Complaint ¶ 6. Instead, it is the Commissioner's particular method of enforcing the statute that violates the Commerce Clause. Accordingly, the Court does not find that the Rogers–Allen Act, as amended, is itself invalid under the Commerce Clause.

The amended Act does contain the provision providing the Commissioner with the authority to promulgate compensatory payment requirements like those in Parts 22 and 23. Plaintiffs have made no showing, however, that if the Commissioner's orders are declared unconstitutional by declaratory judgment he will nevertheless promulgate future similar orders or order Plaintiffs to pay the compensatory payments allegedly owed. Absent any such showing, the Court declines to grant injunctive relief.

### b. Section 1983

■■■ Section 1983 provides:

---

**14.** Having found that the challenged regulations are *per se* invalid under the Commerce Clause, rather than "regulat[ing] evenhandedly to effectuate a legitimate local public interest," the Court need not apply the test of *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), in which the Supreme Court weighed both the local interests supported by the statute and the statute's burden on interstate commerce. *See Wyoming,* 112 S.Ct. at 800 n. 12 (declining to apply *Pike* test where statute discriminated both on its face and in practical effect).

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. While suits for damages against state officials sued in their official capacity, as Defendant is here, are barred by the Eleventh Amendment, *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985), "[i]n an injunctive or declaratory action grounded on federal law, the State's immunity *can* be overcome by naming state officials as defendants." [15] *Id.* at 169 n. 18, 105 S.Ct. at 3107 n. 18.

The Supreme Court recently has held that violations of the Commerce Clause may constitute the basis of an action under 42 U.S.C. § 1983. In *Dennis v. Higgins*, — U.S. —, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991), the Supreme Court stated that "the Commerce Clause of its own force imposes limitations on state regulation of commerce, and is the source of a right of action in those injured by regulations that exceed such limitations." *Id.* 111 S.Ct. at 872. Accordingly, the Court held in *Dennis* that the Supreme Court of Nebraska had erred in holding that the Plaintiff's Commerce Clause action challenging the constitutionality of certain "retaliatory" taxes and fees on motor carriers could not be brought under 42 U.S.C. § 1983. *Id.* at 873.

This is an action brought against the Commissioner in his official capacity as Commissioner of the New York State Department of Agriculture and Markets.[16] Plaintiffs claim that the Commissioner "has promulgated unconstitutional regulations and otherwise indicated his intention to enforce the Amendment to section 258–m of the New York Agriculture and Markets Law and to require the payment of so-called 'compensatory payments,'" Farmland Complaint ¶ 15; Lehigh Valley Complaint ¶ 33, thus depriving Plaintiffs of their rights under the Commerce Clause. The Court has found that the compensatory payment mechanisms promulgated by the Commissioner are *per se* invalid under the Commerce Clause. Accordingly, the Court grants summary judgment on Plaintiff's request for a declaratory judgment, declaring that the Commissioner's deprivation of Plaintiffs' constitutional rights under the Commerce Clause through the establishment and enforcement of the compensatory payment requirements contained in Parts 22 and 23 is in violation of 42 U.S.C. § 1983.[17] For the reasons stated above, Plaintiffs' request for injunctive relief is denied.

### 4. F.O.B. Milk

Tuscan contends that the Commissioner's requirement that Tuscan pay the New York established premium for New York milk purchased by Tuscan F.O.B. its plant in New Jersey violates the Commerce Clause. In its statement pursuant to Local Rule 3(g), Tuscan states that it purchases over 8,000,000 pounds of milk per month from Dairylea, a cooperative association of dairy farmers, F.O.B. Tuscan's New Jersey plant and that Tuscan receives title to such F.O.B. milk in New Jersey.[18] Tuscan ar-

---

**15.** Monetary relief that is "ancillary" to injunctive relief is also permitted. *Id.*, 473 U.S. at 169 n. 18, 105 S.Ct. at 3107 n. 18 (citing *Edelman v. Jordan*, 415 U.S. 651, 667–68, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974)).

**16.** Farmland's suit is against the Commissioner in his official capacity only. Farmland Complaint ¶ 4. The Lehigh Valley complaint, on the other hand, states that the Commissioner "is sued in [his] official capacity and as an individual." Lehigh Valley Complaint ¶ 9. Since the Commissioner was clearly acting under color of state law in promulgating the regulations and is sued for injunctive relief only, this difference is not material to the outcome of this § 1983 claim.

**17.** Tuscan's § 1983 claim as to New York's regulation of the prices to be paid for F.O.B. milk is discussed below.

**18.** Tuscan's assertions are consistent with the Uniform Commercial Code definition of F.O.B. and determination of when title passes. Both

gues that by imposing its minimum price on the F.O.B. milk, New York is "control[ling] directly a transaction occurring outside of its jurisdiction." Lehigh Valley Mem. in Supp. at 28.

In *Milk Control Board v. Eisenberg Farm Products*, the Supreme Court established that a state's fixing of producer prices for milk produced and sold within its borders, even where the milk subsequently entered interstate commerce, was a proper exercise of the state's police power. 306 U.S. at 351–53, 59 S.Ct. at 530–31. Tuscan argues that *Eisenberg* does not control the question here, since the Pennsylvania statute at issue in that case did not "essay to regulate or to restrain the shipment of the respondent's milk [out of state] or to regulate its sale or the price at which respondent may sell it in [a different state]." *Id.* at 352, 59 S.Ct. at 531. The statute regulated the price at which the respondent, a "dealer" under the definition of the statute, purchased milk from the Pennsylvania farmers at its receiving plant in Pennsylvania. *Id.* at 349, 59 S.Ct. at 529–30.

The cases cited by Tuscan at a minimum establish that New York cannot dictate at what price milk produced in other states must be purchased, something which New York does not here attempt to do. In *Baldwin*, for example, New York required that a certain price be paid to a Vermont farmer for Vermont-produced milk before such milk could be sold in New York. 294

U.S. at 519, 55 S.Ct. at 498–99. *Schwegmann Brothers Giant Super Markets v. Louisiana Milk Commission*, also cited by Tuscan, does support the argument that if title to the New York milk passes in New Jersey, New York may not control the price, even though the milk was produced in New York.[19] 365 F.Supp. 1144, 1155 (M.D.La.1973), *aff'd*, 416 U.S. 922, 94 S.Ct. 1920, 40 L.Ed.2d 279 (1974). However, in *Schwegmann*, which involved sales between a Tennessee manufacturer of ice milk and a Louisiana distributor, Louisiana's interest in protecting its dairy farmers was not in issue.

Under the rationale in *Country Classic Dairies v. Milk Control Bureau*, 847 F.2d 593 (9th Cir.1988), a determination that New York may not control the price of the F.O.B. milk is not appropriate for summary judgment in this case due to the limited facts presently before the Court. The Ninth Circuit in *Country Classic* found inappropriate a district court's determination on motion for summary judgment that the milk at issue there was not in interstate commerce and that Montana's regulation of the wholesale price of the subject milk did not violate the Commerce Clause. *See id.* at 596. The Ninth Circuit determined that the milk was in interstate commerce,[20] *id.* at 594, and remanded "for a trial in which the parties may fully develop the facts about the milk transactions.... On these facts the district court may decide whether

New Jersey and New York have adopted the U.C.C. "The term F.O.B. ... is a delivery term under which ... when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them." U.C.C. § 2–319. "Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." *Id.* § 2–401.

19. In *Schwegmann*, Louisiana attempted to control the price of ice milk bought by a Louisiana partnership for resale in Louisiana from a Tennessee manufacturer, Pure–Vac Dairy Products Corp., where the ice milk was purchased in Tennessee but shipped into Louisiana in Pure–Vac's trucks. The court stated that if title passed in Tennessee, the mere transportation and delivery in Pure–Vac's trucks was not suffi-

cient to uphold a lower court determination that Louisiana could regulate the price paid to Pure–Vac. The court found that the applicable contract law would determine the point at which title to the ice milk passed. The Court thus implied that if title passed in Louisiana, Louisiana could control the price. On this reading, if title to Dairylea's milk passes in New Jersey, control over the price shifts to New Jersey.

20. The milk was purchased by a dairy in Montana, delivered to Wyoming, sold there at a negotiated price below Montana's regulated wholesale price, and resold in Montana at Montana's regulated retail price. In determining that "Country Classic's milk is an object of interstate trade," the Ninth Circuit emphasized that, "[a]fter delivering the milk across state lines, Country Classic conveys title in Wyoming, ... [and r]isk of loss passes ... in Wyoming." *Id.* at 594.

the ... regulation discriminates against interstate commerce or creates an impermissible risk of inconsistent regulation by different states." *Id.* at 596.

*Mississippi ex rel. Patterson v. Pure Vac Dairy Products Corp.*, 251 Miss. 457, 170 So.2d 274 (1964), also indicates that more facts are needed before this Court can resolve Tuscan's F.O.B. issue. In *Pure Vac*, which entailed circumstances similar to those in Schwegmann and concerned the same Tennessee manufacturer, the Mississippi Supreme Court found constitutional Mississippi's regulation of the price at which the Tennessee manufacturer, Pure Vac, could sell milk products in Mississippi, although Pure Vac claimed that the milk was sold F.O.B. its docks in Memphis. The delivery of the milk products into Mississippi was controlled by Pure Vac, but Pure Vac argued that "title passed at the dock at Memphis and the products were delivered from Pure Vac, the manufacturer, to Pure Vac, as hauler." *Id.* at 276. After scrutinizing the facts surrounding the transaction, the court concluded that this was a "fiction of duality" and that possession was in fact delivered in Mississippi. Thus, regulation of the price at which the milk products could be sold was a proper exercise of Mississippi's police power. *Id.* at 278; *cf. Schwegmann*, 365 F.Supp. at 1155 ("Louisiana has unduly burdened interstate commerce insofar as it attempts to" regulate the price paid to Pure–Vac on sales of ice milk in Tennessee "with shipment by Pure–Vac into Louisiana *under the circumstances described above*" (emphasis added)).

The record before the Court contains few facts concerning New York's interest in regulating the price of the F.O.B. milk and the relative burden on interstate commerce of Tuscan's paying to Dairylea the New York minimum price for New York milk. Only minimal facts regarding the transaction itself are provided. Under either tier of the Commerce Clause analysis, this Court must examine the overall effect of the challenged requirement on both local and interstate activity. *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084. A more complete record is needed before the Court can make a fair and reasoned decision as to whether New York's price regulation of the F.O.B. milk unconstitutionally burdens interstate commerce. Since Tuscan's § 1983 claim as to the F.O.B. milk hinges on a determination that New York's regulation of the price of such milk violates the Commerce Clause, summary judgment as to that claim is also denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for summary judgment for declaratory relief are granted with respect to interim orders Parts 22 and 23, insofar as those orders require dealers of non-New York milk to make compensatory payments which would ultimately benefit New York farmers. Plaintiffs' request for injunctive relief is denied. Plaintiffs are entitled to costs, and to attorneys fees pursuant to 42 U.S.C. § 1988. Plaintiffs are to file an application for attorneys fees and costs, serving a copy on Defendant, within 20 days. Defendant's counterclaims as to the compensatory payments are dismissed. Summary judgment on the claim that New York cannot regulate the price paid for New York milk sold F.O.B. destinations in other states is denied.

IT IS SO ORDERED.