8                                                      415 Mass. 8

West Lynn Creamery, Inc. *v.* Commissioner of the Department of Food & Agriculture.

WEST LYNN CREAMERY, INC., & another[1] *vs.*
COMMISSIONER OF THE DEPARTMENT OF FOOD AND
AGRICULTURE (and two companion cases[2]).

Suffolk. January 6, 1993. - April 15, 1993.

Present: WILKINS, ABRAMS, NOLAN, LYNCH, & GREANEY, JJ.

*Constitutional Law*, Interstate commerce. *Milk Control.*

A milk pricing order pursuant to G. L. c. 94A, §§ 10-12, issued by the
    Department of Food and Agriculture, did not discriminate against in-
    terstate commerce so as to violate the commerce clause of art. 1, § 8, of
    the United States Constitution, where the order, having as its purpose
    the preservation of the viability of the milk industry in the Common-
    wealth, was not discriminatory on its face; where the order was applied
    evenhandedly to in-State and out-of-State dealers; and where the regu-
    latory burden it imposed on interstate commerce, by requiring all li-
    censed milk dealers to contribute, according to a prescribed formula, to
    an "equalization fund" for distribution to Massachusetts producers, was
    merely indirect and incidental. [14-19]

CIVIL ACTIONS commenced in the Superior Court Depart-
ment, one on July 24, 1992, and two on November 18, 1992.

Motions for preliminary injunctive relief were heard by *R.
Malcolm Graham*, J., and *John L. Murphy, Jr.*, J.,
respectively.

After the latter two cases were reported to the Appeals
Court by *J. Harold Flannery*, J., the proceedings were con-
solidated for hearing in that court. The Supreme Judicial
Court transferred them on its own initiative.

*Michael L. Altman* (*Margaret A. Robbins* with him) for
the plaintiffs.

---

[1]LeComte's Dairy, Inc.

[2]West Lynn Creamery, Inc. *vs.* Commissioner of the Department of
Food and Agriculture (judicial review of license revocation); LeComte's
Dairy, Inc. *vs.* Commissioner of the Department of Food and Agriculture
(judicial review of license revocation).

415 Mass. 8 9

West Lynn Creamery, Inc. v. Commissioner of the Department of Food & Agriculture.

*Eric A. Smith*, Assistant Attorney General, for the defendant.

The following submitted briefs for amici curiae:

*Robert J. Sherer & Francis A. DiLuna* for Massachusetts Farm Bureau Federation.

*Allen Tupper Brown* for Massachusetts Association of Dairy Farmers & others.

*Marshall M. Schribman* for Massachusetts Cooperative Milk Producers Federation, Inc.

*Steven J. Rosenbaum & Andrew I. Schoenholtz*, of the District of Columbia, *& Richard M. Zielinski, Neil V. Mc-Kittrick & Joshua M. Davis* for Milk Industry Foundation.

NOLAN, J. The plaintiffs, West Lynn Creamery, Inc. (West Lynn), and LeComte's Dairy, Inc. (LeComte), are milk dealers licensed by the Department of Food and Agriculture (department) pursuant to G. L. c. 94A (1990 ed.).[3] West Lynn is a domestic corporation with its principal place of business in Lynn. West Lynn purchases milk from producers and producer-cooperatives and sells in Massachusetts about sixty per cent of the milk purchased.[4] West Lynn purchases most of its milk from out-of-State producers. LeComte is also a domestic corporation with its principal place of business in Somerset. LeComte purchases all of its milk from West Lynn and sells it to retailers, convenience stores, nursing homes, and restaurants.

Under G. L. c. 94A, the Commissioner of the department is vested with wide-ranging powers to supervise and regulate the milk industry of the Commonwealth. § 2. Among other things, the Commissioner is empowered to issue licenses to milk dealers, § 5, and to establish minimum prices to be paid for milk "which will best protect the milk industry in the commonwealth and insure a supply of pure, fresh milk adequate to cover consumer needs." § 10. The Commissioner

---

[3] The department defines a "dealer" as "any person who is engaged within the Commonwealth in the business of receiving, purchasing, pasteurizing, bottling, processing, distributing, or otherwise handling milk."

[4] The department defines a "producer" of milk as "any person producing milk from dairy cattle."

fixes the minimum price to be paid to milk "producers" by issuing an order. §§ 11, 12. The Commissioner is empowered to suspend or revoke the license of a milk dealer who fails to comply with department orders, rules, or regulations. §§ 6, 7. The root of the dispute in the present cases is the Commissioner's revocation of the plaintiffs' milk dealers' licenses due to their failure to comply with a pricing order. The plaintiffs contend that the pricing order violates the commerce clause of art. I, § 8, of the United States Constitution.[5] We disagree.

The order that is the subject of this case was issued by the Commissioner in response to the economic crisis facing dairy farmers in Massachusetts. The background to the issuance of the order is as follows. In November, 1991, a petition was delivered to the department requesting that the Commissioner hold hearings regarding the state of the dairy industry in Massachusetts. See G. L. c. 94A, § 12. The Commissioner held public hearings in January, 1992, conducted subsequent investigations, and interviews, and thereafter declared that the Massachusetts dairy industry was in a state of emergency.[6]

---

[5]The commerce clause provides that "congress shall have power to regulate commerce with foreign nations, and among the several states."

[6]The Commissioner declared that "an emergency of unprecedented proportions exists within the Massachusetts dairy industry. This crisis threatens . . . the economy of our entire state, the enviable lifestyle we enjoy here, and the health of our consumers. . . .

"The industry, nationwide, is in serious trouble, and ultimately a federal solution will be required. In the meantime, we must act on the state level to preserve our local industry and its attendant benefits. While the dairy farmers receive prices for their product equal to those in 1978, the costs of producing milk continue to skyrocket out of their control. . . .

"Dairying maintains hundreds of thousands of acres of open space and the scenic vistas on which our state's vital tourist industry depends. It generates millions of dollars into our economy, in payroll, taxes and purchases, while providing a fresh and nutritious food product at a fraction of the price paid by consumers elsewhere in the nation and the world.

"Therefore, I hereby declare that a state of emergency exists in relation to the Massachusetts dairy producers and that immediate action must be taken to address this problem."

On February 26, 1992, in response to this state of emergency, the Commissioner issued an amended pricing order, pursuant to G. L. c. 94A, §§ 10-12.[7] The pricing order sets forth a plan designed to boost the amount of money local dairy farmers — the producers — receive for milk above and beyond that required by the Federal program.[8] The pricing order requires milk dealers to submit monthly reports and to contribute to the Massachusetts Dairy Equalization Fund (fund). The monthly reports require, among other things, each licensed milk dealer to report the amount of "Class I" milk sold for consumption in Massachusetts during the reporting period.[9] Each milk dealer's monthly contribution to the Fund is calculated by multiplying the volume of "Class I" milk sold during the reporting month, regardless of point of origin, by an "Order Premium."[10] The Commissioner distributes the fund to producers in proportion to the milk produced in Massachusetts during the preceding month. The

[7]The Commissioner's first order was issued on February 18, 1992. The amended order was issued "for technical, clarification purposes." The February 18, 1992, order is not at issue on this appeal.

[8]The preamble to the pricing order provides: "The purpose of this Order is to provide an immediate interim solution to the state of emergency facing the Massachusetts dairy industry. The price the farmer is paid for his milk is established by a highly regulated federal pricing system. Massachusetts producers are facing an emergency situation due to these federally set prices. This Order sets a target minimum price to be paid by milk dealers to Massachusetts producers, above the federally established minimum milk price. The terms and conditions of the Order take into consideration the regional nature of the flow of milk, as well as the amount necessary for all sectors of the industry to yield a reasonable return on their product. Through stabilizing the price producers are paid for their product, consumers will be assured of a local supply of fresh milk."

[9]The "Class I" designation refers to milk consumed as fluid rather than processed into other products, e.g., cheese.

[10]The pricing order establishes a target price for milk. The order premium is equal to one-third of the difference between the target price and the so-called "blend price" reported monthly by the United States Department of Agriculture. In the pricing order the Commissioner fixed the target price at $15 a hundred pounds of milk (hundredweight or cwt.). Assuming that the federally mandated price is $12 a cwt., the order premium would be $1.

pricing order took effect immediately. The first monthly report, covering April, 1992, was due May 25, 1992.

West Lynn and LeComte submitted reports for the periods April through July, 1992. The plaintiffs paid their premiums for April and May, but discontinued payments thereafter. On July 24, 1992, the plaintiffs filed an action in the Superior Court Department alleging, among other things, that the pricing order violated the commerce clause. They argued that the pricing order places out-of-State farmers at a competitive disadvantage because it subsidizes Massachusetts farmers but not out-of-State farmers, all of whom are selling milk in Massachusetts, and sought declaratory relief, damages, a preliminary injunction, and a permanent injunction to prevent the Commissioner from collecting the monthly premiums. On July 31, 1992, a judge in the Superior Court denied the plaintiffs' request because they had failed to establish irreparable harm. The judge also denied their request to deposit the required premiums with the court.[11]

Meanwhile, West Lynn and LeComte continued to dispute the legality of the pricing order, and failed to comply with its provisions. In June and July, 1992, the Commissioner initiated administrative action against both West Lynn and LeComte seeking to suspend or to revoke their licenses for failing to comply with the pricing order.

In response to the Commissioner's action, on August 7, 1992, plaintiffs filed an "emergency" motion for a preliminary injunction seeking the same relief that the earlier motion sought: a preliminary injunction enjoining the Commissioner from imposing any penalty, including but not limited to, suspending or revoking their milk dealers' licenses for failure to pay the equalization premiums required by the Commissioner's amended pricing order. On August 14, 1992, the judge denied the requests for preliminary injunctive relief because the plaintiffs again failed to demonstrate any irrepa-

---

[11]The plaintiffs assert that, once the payments are paid into the fund and distributed to Massachusetts dairy farmers, there is no practical remedy for recouping the funds if the pricing order is found to be unconstitutional.

415 Mass. 8                                                    13

West Lynn Creamery, Inc. *v.* Commissioner of the Department of Food & Agriculture.

rable harm. The judge held that payment into the fund does not constitute irreparable harm because the pricing order does not require the plaintiffs to absorb the cost of the equalization premiums. Rather, the judge reasoned, the plaintiffs can pass on the equalization premiums to consumers. The judge also noted that, if the Commissioner should suspend or revoke the plaintiffs' licenses, his decision is reviewable, G. L. c. 94A, § 8; hence, their claim was premature.

On September 14, 1992, the Commissioner held hearings, and on November 16, 1992, conditionally revoked the plaintiffs' licenses, see G. L. c. 94A, §§ 6, 7, for failing to comply with the pricing order.[12] The Commissioner denied the plaintiffs' commerce clause challenge, stating, "[W]hile the [Pricing] Order is designed to benefit Massachusetts dairy farmers, it does not do so by discriminating against or burdening interstate commerce. The Order is applied evenhandedly to all milk dealers, wherever located, handling milk for sale in Massachusetts. The Order does not discriminate among dealers based on the source of the milk they purchase or the amount of milk they sell in other states."

On November 17, 1992, the plaintiffs filed a second emergency motion for a preliminary injunction requesting that the Superior Court enjoin the Commissioner from revoking their licenses. In an affidavit supporting its motion, West Lynn stated that it did not intend to comply with the conditions of the Commissioner's November 16 order. West Lynn also noted that, if it is not licensed to sell milk in the Commonwealth, more than 1,000 employees may be laid off. Additionally, on November 18, 1992, the plaintiffs filed separate actions in the Superior Court seeking judicial review of the Commissioner's decisions to revoke the plaintiffs' milk licenses, G. L. c. 94A, §§ 8, 21, and requesting stays of enforcement action pending judicial review.

---

[12]The Commissioner conditioned revocation of the licenses on continuing noncompliance with the pricing order. The Commissioner's revocation order was effective fourteen days after issuance.

On November 24, 1992, a Superior Court judge, in a consolidated order, amended on November 25, denied the plaintiffs' second request for an emergency preliminary injunction, and their request for a stay of the revocation action pending judicial review. The judge reasoned that the plaintiffs had failed to demonstrate a reasonable likelihood of success on the merits and that they would suffer irreparable harm. The judge wrote that the plaintiffs should "pay the assessment [premium] and seek an early hearing on the merits." The plaintiffs then petitioned a single justice of the Appeals Court, G. L. c. 231, § 118, 1st par. (1990 ed.), seeking interlocutory relief from the Superior Court's denial of the emergency motion for a preliminary injunction. On November 25, 1992, the single justice issued an order staying the Commissioner's November 16, 1992, revocation orders pending further review. After a hearing on December 1, 1992, the single justice agreed to extend the stay beyond December 15, 1992, if the plaintiffs paid the amounts due under the pricing order for the months June, July, and August, 1992.

On December 11, 1992, another judge in the Superior Court reserved and reported the plaintiffs' cases concerning judicial review of the Commissioner's revocation orders to the Appeals Court. See Mass. R. Civ. P. 64, 365 Mass. 831 (1974). On December 15, 1992, the Appeals Court granted a motion to consolidate the three cases.

To expedite the appeals, the parties agreed, with the assent of the single justice, to seek interlocutory relief from a panel of the Appeals Court pursuant to G. L. c. 231, § 118, 2d par. We transferred these cases to this court on our own motion, and we hold the pricing order constitutional.

The sole question facing us from the three appeals concerns the constitutionality of the pricing order. It is long established that, while a literal reading of the commerce clause evinces a grant of power to Congress, it "directly limits the power of the States to discriminate against interstate commerce." *Wyoming* v. *Oklahoma*, 502 U.S. 437, 454 (1992). "This 'negative' aspect of the Commerce Clause prohibits economic protectionism — that is, regulatory measures

designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.*, quoting *New Energy Co. of Ind.* v. *Limbach*, 486 U.S. 269, 273-274 (1988). If the Commissioner's pricing order discriminates against interstate commerce, either on its face or in practical effect, the burden falls on the Commissioner "to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Maine* v. *Taylor*, 477 U.S. 131, 138 (1986), citing *Hughes* v. *Oklahoma*, 441 U.S. 322, 336 (1979). Justification supporting a discriminatory measure is subjected to strict scrutiny. *Id.* at 138, 144. In cases where the regulatory measure under study amounts to "simple economic protectionism, a 'virtually *per se* rule of invalidity' has applied." *Wyoming* v. *Oklahoma*, *supra* at 800, quoting *Philadelphia* v. *New Jersey*, 437 U.S. 617, 624 (1978).

On the other hand, if the pricing order has only indirect or incidental effects on interstate commerce, it will be found to violate the commerce clause only if the burdens imposed on interstate commerce are "clearly excessive in relation to the putative local benefits." *Maine* v. *Taylor*, *supra* at 138, quoting *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Court has applied reduced scrutiny in such cases, but there is no clear line separating close cases on which scrutiny should apply. See *Wyoming* v. *Oklahoma*, *supra* at 800 n.12, and cases cited.

As one would expect, the plaintiffs contend that the Commissioner's pricing order is discriminatory on its face, and argue in favor of the application of strict scrutiny. The Commissioner contends that we should review the matter with reduced scrutiny because the pricing order burdens interstate commerce incidentally, if at all. We hold that the pricing order does not discriminate on its face, is evenhanded in its application, and only incidentally burdens interstate commerce. Our conclusion flows from the manner in which milk dealers are called on to contribute to the Fund.

All milk dealers that sell Class I milk for consumption in Massachusetts are required to contribute to the fund. Ac-

cordingly, the pricing order does not favor in-State milk dealers to the detriment of its out-of-State competitors. In this regard, then, the pricing order is evenhanded in its design and effect.

The pricing order does not establish a minimum price milk dealers must pay for milk regardless of point of origin. See *Baldwin* v. *G.A.F. Seelig, Inc.*, 294 U.S. 511, 519 (1935). Rather, the milk dealer's premium, as required under the pricing order, is fixed only by the Commissioner's target price, the federally mandated price, and the amount of milk the dealer sells for consumption in Massachusetts. See *supra* at 11-12 & note 10. A milk dealer's required premium is independent of the price the milk dealer has paid for the milk or the milk's point of origin. In this way the pricing order does not manifest any preference for in-State milk over out-of-State milk.

The pricing order is not an attempt to promote the sale of Massachusetts milk to the detriment of out-of-State producers. On the contrary, milk dealers have every reason to seek out the lowest unit price for milk as it will reduce their costs. As noted above, the premium required under the pricing order is independent of the price paid for the milk or its point of origin.

Further, the plaintiffs argue that the pricing order denies out-of-State milk producers the opportunity to compete with in-State milk producers because out-of-State milk, if sold in Massachusetts, is subject to the Massachusetts premium. Assuming, without deciding, that the plaintiffs, as milk dealers, have standing to raise this challenge, the argument is without merit. For the reasons mentioned above, we are not persuaded that the pricing order provides milk dealers an incentive to purchase milk from in-State producers rather than from out-of-State producers.

The Commissioner's pricing order was designed to aid only Massachusetts producers. Indeed, Massachusetts producers are entitled to disbursements from the fund based on the volume of milk produced, to the exclusion of out-of-State competitors. The plaintiffs contend that this discriminatory dis-

tribution plan burdens interstate commerce because it will cause less out-of-State milk to be imported into Massachusetts. As Massachusetts farmers receive more and more money from the fund, the plaintiffs argue, Massachusetts producers will produce more milk, and local production will then constitute a greater percentage of the total milk sold in Massachusetts.

Again we assume, without deciding, that the plaintiffs have standing to assert such a challenge. We concede that the fund distribution scheme affects interstate commerce in this manner but it does so only incidentally. Contrary to the assumption underlying the plaintiffs' argument, it is clear from the Commissioner's "Report Subsequent to Public Hearing" on the state of the dairy industry in Massachusetts, that fund distributions represent an infusion of capital designed solely to save an industry from collapse.[13] Given the Commissioner's report and the balance of the record, we cannot say that fund distributions were intended, or would be sufficient, to expand and develop the Massachusetts dairy industry such that the Commonwealth would be less dependent on "foreign" milk producers.

This is not to say, however, that the fund distribution plan is without its adverse impact on interstate commerce. Common sense necessitates a contrary conclusion. The fund distribution scheme does burden out-of-State producers, to the extent that these producers are not entitled to receive fund disbursements, but we hold that the burden is incidental given the purpose and design of the program.

---

[13]The Commissioner found that the dealers' evidence did not support their claim that the order would affect the price out-of-State producers received from Massachusetts dealers. He further rejected the claim that the order would increase milk production by Massachusetts producers. He found that the record showed that Massachusetts producers had decreased production since the order had gone into effect. The Commissioner reasoned that the prediction of an increase of production was "speculative, given the uncertain duration of the Order, the time, facilities, workload, and initial investment involved to increase a herd size, and the fact that the Order places a cap on the amount of monthly payments to producers."

The plaintiffs' reliance on *Baldwin* v. *G.A.F. Seelig, Inc.,* *supra,* is misplaced. *Baldwin,* like the present case, involved milk dealers and State regulation of milk prices. The *Baldwin* regulation, however, differs from that under study in the present cases. In *Baldwin,* the United States Supreme Court found unconstitutional a regulation that prohibited State licensed milk dealers from selling milk produced out-of-State unless the out-of-State milk producers were paid New York's minimum price for the milk. *Baldwin* v. *G.A.F. Seelig, Inc.,* *supra* at 519. Justice Cardozo wrote, "If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation." *Id.* at 522.

The constitutional infirmity in *Baldwin* was not New York State's desire to aid its farmers to the exclusion of out-of-State farmers but, rather, the protectionist nature of the regulation. While the pricing order in the present case was born of a similar concern for the dairy farmer, the support system that the Commissioner has promulgated, as discussed above, cannot fairly be said to be discriminatory or protectionist as was the one at issue in *Baldwin.*[14]

In the present case, "[t]he end to be served is the maintenance of a regular and adequate supply of pure and wholesome milk, the supply being put in jeopardy when the farm-

[14]The plaintiffs also direct our attention to *Farmland Dairies* v. *McGuire,* 789 F. Supp. 1243, 1248 n.5 (S.D.N.Y 1992), in support of their argument. To the extent that we can discern from the opinion, it is inapposite. *McGuire,* like the present cases, involved State pricing regulation of the milk industry. Like *Baldwin* v. *G.A.F. Seelig, Inc.,* 294 U.S. 511 (1935), and with similar fate, the State involved was New York. The fact distinguishing *McGuire* from the present case is that the price New York State farmers were paid for milk "increased proportionately with the amount of non-New York Class I milk sold in New York." *Id.* at 1248 n.5. Thus the *McGuire* pricing order provided incentive for milk dealers to purchase milk produced in New York to reduce their milk purchasing expenses. As the *McGuire* court found, a regulatory scheme tilted in such a fashion to benefit in-State interests impermissibly burdens interstate commerce. *Id.* at 1254.

ers of the state are unable to earn a living income." *Id.* at 523, citing *Nebbia* v. *New York,* 291 U.S. 502 (1934). Such an end is legitimate. See *Baldwin, supra* at 519. The power of the Commonwealth to regulate the milk industry within its borders is clear. See *Farmland Dairies* v. *McGuire,* 789 F. Supp. 1243, 1251 (S.D.N.Y 1992) (State is empowered to fix minimum prices for milk sold by dairy farmers within its borders), citing *Polar Ice Cream & Creamery Co.* v. *Andrews,* 375 U.S. 361, 378 (1964). The premiums required under the pricing order may have detrimental financial impacts on milk dealers such as West Lynn and LeComte, but those detrimental impacts alone do not in our view run afoul of the commerce clause. Rather, the premiums represent one of the costs of doing business in the Commonwealth, a cost all milk dealers must pay. The Commissioner's pricing order may have the unintended adverse effect of reducing the economic viability of milk dealing in Massachusetts. While this may be the case, relief is beyond our province.

In view of the merely incidental burden on interstate commerce, the end to which the pricing order is aimed, and the resultant benefit to the Commonwealth's dairy industry, we conclude that local benefits outweigh any incidental burden on interstate commerce and hold that the pricing order does not violate the commerce clause. We remand the cases to the Superior Court for action not inconsistent with this opinion.

*So ordered.*