**Kenneth ADAMS, Seth Bunker and Rodney Hudson, et al., Plaintiffs, Appellants,**

v.

**Gregory WATSON as Commissioner, Massachusetts Department of Food and Agriculture, et al., Defendants, Appellees.**

No. 93–1068.

United States Court of Appeals, First Circuit.

Heard May 3, 1993.

Decided Dec. 8, 1993.

---

**916**

Michael L. Altman, with whom Margaret A. Robbins and Rubin & Rudman were on brief, for appellants.

Eric A. Smith, Asst. Atty. Gen., with whom Scott Harshbarger, Atty. Gen., was on brief, for Commissioner of the Massachusetts Dept. of Food and Agriculture.

Robert J. Sherer, with whom Francis A. DiLuna and Roche, Carens & DeGiacomo were on brief, for Massachusetts Farm Bureau Federation, Inc.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Plaintiffs-appellants, New York and New Hampshire dairy farmers, instituted the present civil rights action against the Commissioner of the Massachusetts Department of Food and Agriculture (Commissioner) for declaratory and injunctive relief from an alleged unconstitutional enforcement of a Massachusetts milk pricing order. The district court dismissed their complaint for lack of standing. We now reverse.

# I

## BACKGROUND

On January 28, 1992, the Commissioner declared a state of emergency in the Massachusetts dairy industry, see Mass.Gen.L. ch. 94A, § 12 (1992), based on findings that rising production costs and flat dairy prices were devastating the industry.[1] The Commissioner determined that a price stabilization system was necessary. The pricing order issued by the Commissioner on February 26, 1992, forms the focus of this appeal.

The pricing order established a "Dairy Equalization Fund" (Fund), into which each licensed milk distributor (dealer) in Massachusetts is required to pay monthly assessments ("differential assessments") equal to one-third of the amount by which the $15 price set by the pricing order exceeds the applicable federal minimum or "blend" price per hundredweight (cwt).[2] The differential

---

1. In 1991, for example, the average milk price paid Massachusetts dairy farmers was $12.64 per hundredweight (cwt), whereas their average production cost was $15.50 per cwt—an average loss of $2.86 per cwt. The Commissioner specifically found that the emergency threatened Massachusetts' local "supply of fresh milk."

2. The United States dairy industry is subject to extensive price regulation. The United States Department of Agriculture promulgates federal milk marketing orders, pursuant to the Agricultural Marketing Agreements Act of 1937, 7 U.S.C. § 601, et seq., which establish minimum milk prices. The marketing order in effect in Massachusetts is New England Federal Milk Marketing Order No. 1 (Order No. 1). See 7 C.F.R. § 1001 (1993). The minimum milk price ("blend price") is calculated monthly, using a

assessment applies to all milk marketed in Massachusetts by licensed dealers, whether produced in Massachusetts or elsewhere. Notwithstanding the fact that dealers must pay the differential assessment calculated on all out-of-state and in-state produced milk, out-of-state producers, who supply most of the milk sold in Massachusetts,[3] are not entitled to disbursements from the Fund. The monies in the Fund are distributed monthly among Massachusetts milk producers only, in direct proportion to their respective percentage of the total Massachusetts milk production, subject to a monthly payment cap to each Massachusetts producer equal to the differential assessment on 2000 cwt. Excess monies in the Fund are remitted to dealers in direct proportion to their payments into the Fund.

Plaintiffs-appellants, out-of-state producers, sell their entire milk production to West Lynn Creamery, Inc., a licensed Massachusetts milk dealer. Their original civil rights complaint demanded (i) a declaratory judgment that the pricing order violates the Commerce Clause,[4] (ii) the refund of all amounts previously disbursed from the Fund to Massachusetts producers, and (iii) injunctive relief against further enforcement of the pricing order.

The first amended complaint[5] included allegations that the pricing order caused appellants competitive injury and economic harm.[6] On defendants' motion, the district court dismissed the first amended complaint for lack of standing, finding its "general allegations of economic harm … unsupported by any specific, factual allegations of injury." *Adams v. Watson,* No. 92–11641–Z, 1992 WL 390721 at *2, 1992 U.S.Dist. LEXIS 19306, at *4 (D.Mass.1992). The district court noted that the first amended complaint contained no allegations that the plaintiffs had sold less milk in Massachusetts since February 26, 1992, received a lower price for their milk, or were otherwise frustrated in their attempt to "undersell" Massachusetts producers.

The district court denied plaintiffs' motion to recast their first amended complaint by adding two paragraphs for the stated purpose of alleging "with greater specificity 'injury in fact' to meet the requirement of more 'specific, factual allegations of injury.'" The district court summarily denied the ensuing motion for relief from judgment under Fed. R.Civ.P. 60.

## II

### DISCUSSION

#### A. *Applicable Law of Standing.*

Article III of the Constitution limits federal "judicial power" to the resolution of

---

market-wide weighted average of the value of all milk sold during the preceding month. No state or dealer may permit regional milk producers to receive less than the per/cwt figure prescribed in Order No. 1.

**3.** Plaintiffs allege that Massachusetts is not a "producer" or "export" state (like, for example, Vermont and Maine), but a highly vulnerable "consumer" or "import" state capable of producing only 10% of the milk sold in the state. As a rule, out-of-state milk commands a high premium in "consumer" states like Massachusetts.

**4.** Commerce Clause violations may be redressed under 42 U.S.C. § 1983. *See Dennis v. Higgins,* 498 U.S. 439, 443–51, 111 S.Ct. 865, 868–73, 112 L.Ed.2d 969 (1991).

**5.** Two nonproducer plaintiffs (Massachusetts milk *dealers*) voluntarily dismissed their claims, following the Commissioner's motion to dismiss their claims on *Younger* and *Burford* abstention grounds. The remaining plaintiffs, appellants here, filed the first amended complaint, which dropped the dealer-plaintiffs and withdrew a claim for damages. West Lynn Creamery, Inc., an original plaintiff, brought a separate state court action challenging the pricing order, under which the Commissioner threatened to suspend its license to sell milk in Massachusetts for failure to pay its monthly differential assessments to the Fund. On April 15, 1993, the Massachusetts Supreme Judicial Court ruled that the pricing order did not violate the Commerce Clause. *See West Lynn Creamery, Inc. v. Commissioner of Dep't of Food and Agric.,* 415 Mass. 8, 611 N.E.2d 239, *cert. granted,* —— U.S. ——, 114 S.Ct. 56, 126 L.Ed.2d 26 (1993).

**6.** The first amended complaint merely alleged that the pricing order "has the same effect as a 'customs duty' or 'protective tariff' on the importation of milk produced in other states," "subsidizes Massachusetts farmers which causes the disorderly marketing of milk," causes out-of-state farmers, including plaintiffs, to suffer economic harm and competitive disadvantage because it subsidizes Massachusetts farmers, and may force out-of-state farmers, including plaintiffs, out of business.

"cases" and "controversies," *see* U.S. Const. art. III; only if it is presented with a "case or controversy" may an Article III court entertain an action. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *United States v. AVX Corp.,* 962 F.2d 108, 113 (1st Cir.1992). In its constitutional formulation, the doctrine of standing is a gatekeeper of justiciability, and "serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1722–23, 109 L.Ed.2d 135 (1990). The "irreducible constitutional minimum of standing" entails three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be "likely" as opposed to merely "speculative," that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations and some internal quotation marks omitted); *see also Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville,* —— U.S. ——, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993); *AVX,* 962 F.2d at 113; *Munoz–Mendoza v. Pierce,* 711 F.2d 421, 424 (1st Cir.1983).[7]

The injury-in-fact inquiry "serves to distinguish a person with a *direct stake* in the outcome of a litigation—*even though small*— from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 690 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973) (citing Kenneth C. Davis, *Standing: Taxpayers and Others,* 35 U.Chi.L.Rev. 601, 613 (1968) ("an identifiable trifle is enough for standing to fight out a question of principle")) (emphasis added); *see Bowman v. Wilson,* 672 F.2d 1145, 1151 (3d Cir.1982) ("The contours of the injury-in-fact requirement, while not precisely defined, are very generous," requiring only that claimant "allege[ ] some specific, 'identifiable trifle' of injury...."); *Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130, 138 (D.C.Cir.1977) (distinct and palpable competitive injury is injury-in-fact for standing purposes even if economic injury is slight in magnitude), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Courts "may reasonably expect that a person so

---

**7.** Prudential limitations on the exercise of federal jurisdiction—self-imposed rules of judicial restraint—may be invoked even if all constitutional essentials are present. As the Supreme Court has acknowledged, however, "it has not always been clear in the opinions of [the] Court whether particular features of the 'standing' requirement have been required by Art. III *ex proprio vigore,* or whether they are requirements that the Court itself has erected and which were not compelled by the language of the Constitution." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Nonetheless, at least three prudential principles bear importantly on "standing". First, the litigant must assert its own legal rights and interests, not those of third parties. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. Second, claimants with "generalized grievances" shared by a large class of citizens and raising "abstract questions of wide public significance" normally will be denied standing, as such questions are more appropriately addressed to the representative branches of government. *Valley Forge,* 454

U.S. at 475, 102 S.Ct. at 760. Finally, the claim presented must come within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

In the instant case, appellees have not suggested that the appellant producers are asserting rights and interests other than their own; the complaint does not allege a "generalized grievance" more appropriately addressed to another branch of government; and appellants, as milk producers who ship in interstate commerce, would appear to be within the "zone of interests" protected by the Commerce Clause, *see Dennis,* 498 U.S. at 449, 111 S.Ct. at 872 (Commerce Clause was intended to benefit those involved in interstate commerce and is the source of a right of action on the part of those injured by state regulation of commerce) (citing *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 320 n. 3, 97 S.Ct. 599, 602 n. 3, 50 L.Ed.2d 514 (1977) ).

harmed will, as best he can, frame the relevant questions with specificity, contest the issues with the necessary adverseness, and pursue the litigation vigorously." *Barlow v. Collins*, 397 U.S. 159, 172, 90 S.Ct. 832, 841, 25 L.Ed.2d 192 (1970).

The responsibility for "clearly and specifically set[ting] forth facts sufficient to satisfy the Article III standing requirements" rests with the claimant. *Whitmore*, 495 U.S. at 155–56, 110 S.Ct. at 1722–24; *see also Lujan*, ——— U.S. at ———, 112 S.Ct. at 2136; *FW/ PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990); *Warth*, 422 U.S. at 518, 95 S.Ct. at 2215; *AVX*, 962 F.2d at 114. Like the trial court, we "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206; *see AVX*, 962 F.2d at 114.[8] " '[E]mpirically unverifiable' conclusions, not 'logically compelled, or at least supported, by the stated facts,' deserve no deference." *Id.* (quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989)). Within this analytic framework, we examine appellants' claims.

## B. *The District Court Decision.*

The district court found that the first amended complaint raised *general* allegations of "economic harm" or "competitive disadvantage" but alleged no "specific" facts which would substantiate actual injury, such as reduced out-of-state milk sales to Massachusetts dealers, or lower milk prices to out-of-state producers. The court noted:

In complaining that the subsidy in itself injures out-of-state farmers, plaintiffs assume a perfectly competitive market in which a direct subsidy to local farmers results in their capture of a larger market

share because they can offer their milk at a lower price. Such analysis ignores the fact that there is [a] federal price support in effect. Because the milk dealers must pay the federal minimum price to *any* dairy farmer, there is no incentive to purchase local rather than out-of-state milk.

*Adams*, No. 92–11641–Z, 1992 WL 390721, at *2 n. 4, 1992 U.S.Dist. LEXIS 19306, at *4 n. 4.

## C. *Allegations of "Competitive Injury."*

Since the proposed second amended complaint did not address the perceived deficiencies in the first amended complaint, and the district court did not elaborate on its reasons for denying the motion to amend, we assume that the court considered the proposed amendment futile. *See Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 59 (1st Cir. 1990). Accordingly, setting to one side the first amended complaint, we inquire whether the second amended complaint alleged an actual or imminent "injury-in-fact" proximately caused by the challenged pricing order. *Id.* (suggesting that denial of motion to amend constitutes abuse of discretion "if no justification appears").

The second amended complaint, paraphrased, alleges that the following chain of economic events will result in appellants' loss of future income, profits, and business opportunities:

All milk currently produced by appellants is sold in the Massachusetts milk market in direct competition with Massachusetts milk producers. As a direct consequence of the differential assessments Massachusetts milk dealers must pay into the Fund for each cwt purchased from producers,[9] consumer milk prices in Massachusetts will rise since dealers, in all likelihood, will pass along at least some portion of their

---

8. Although the Commissioner contends that the district court correctly applied *AVX*'s "heightened" requirements for pleading "standing," *AVX*, 962 F.2d at 113, we note no citation or reference to *AVX* in the district court opinion. Since we conclude that the proposed second amended complaint meets either standard, however, we need not revisit *AVX* in light of the Supreme Court's recent decision in *Leatherman v. Tarrant County Narcotics Intelligence & Coor-*

*dination Unit*, ——— U.S. ———, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

9. Appellants concede that the Fund's *collection* mechanism, by itself, does not injure them. Since Massachusetts dealers must pay an assessment on every cwt purchased, whether produced locally or out-of-state, dealers could not reduce their assessments to the Fund by avoiding out-of-state purchases.

increased costs to Massachusetts consumers.[10]

Consumer demand will decrease as prices increase. In this shrinking market, Massachusetts dealers will continue to buy all available milk produced in Massachusetts, because of their *"preference" for local supplies,* due to the lower transportation costs and lesser producer-to-consumer delivery time (perishability being a major industry concern). Higher milk prices and increased disbursements from the Fund will induce greater milk production by Massachusetts producers, thereby lowering the current 90% Massachusetts market share enjoyed by out-of-state producers. Moreover, even if Massachusetts milk prices were to remain relatively stable, individual Massachusetts producers would have a strong incentive to increase production over their fellow home state dairy farmers, since Fund disbursements are based on each producer's *relative* share of overall Massachusetts milk *production.*

As Massachusetts producers increase their market share, out-of-state milk will be displaced, and "overflow" into interstate commerce. These resulting surplus "interstate" supplies will deflate the federal "blend" or minimum price under Order No. 1. Since appellants previously sold their entire milk production in Massachusetts, some of their out-of-state milk will be "displaced" by Massachusetts-produced milk. As Massachusetts consumer demand decreases, out-of-state producers will no longer be able to command the same premium prices (in excess of the federal "blend price") received before the challenged pricing order. *See supra* note 3. Massachusetts producers will be insulated from any federal blend-price deflation, be-

cause, under the Fund's collection formula the greater the *gap* between $15 and the federal blend price, the larger the differential assessments Massachusetts dealers must pay into the Fund, and therefore, the larger the Fund disbursements to Massachusetts producers (but not to out-of-state producers). Unless remedied, the challenged pricing order eventually would lead to the failure and closure of appellants' businesses.[11]

### D. *"Imminence" and "Particularity" of Economic Injury.*

■ The district court correctly noted that appellants' current income and profits do not substantiate their allegations of economic injury. As of the district court dismissal order, appellants continued to sell their entire milk production to West Lynn Creamery, and neither the volume nor the price had abated since the pricing order went into effect. For their part, appellees cite to several cases holding that the "injury-in-fact" requirement is satisfied at the pleading stage by allegations that the plaintiffs sustained actual financial loss, fairly traceable to the challenged regulation, between its effective date and the filing of the complaint. *See, e.g., Minnesota Milk Producers Ass'n v. Madigan,* 956 F.2d 816, 818–19 (8th Cir.1992) ("The producers have alleged that the provisions of the Secretary's orders directly cause a reduction in the price they receive for their milk.").[12]

■ Although at the pleading stage "injury-in-fact" need not entail currently *realized* economic loss, Article III standing in the commercial context must be premised, at a minimum, on particularized future economic injury which, though latent, nonetheless qua-

---

**10.** By proscribing "unconscionable" consumer price increases, section VIII(b) of the pricing order merely places an outer limit on the total amount of differential assessment costs dealers may pass along to consumers.

**11.** The Commissioner characterizes these dire forecasts as speculative. Nevertheless, the affidavit of West Lynn Creamery's president attests that the dairy industry's economic woes are not restricted to Massachusetts, and that out-of-state milk producers likewise are in precarious financial straits.

**12.** The parties to the present appeal debate whether cases like *AVX,* dealing with "associational standing," have any bearing on the question of the *individual* appellants' "injury-in-fact." An essential element of "associational standing" is injury-in-fact to some *member* of the association. *See AVX,* 962 F.2d at 116. Thus, insofar as these associational standing cases deal with the requirements of "injury-in-fact," we cite them throughout this opinion, as appropriate.

lifies as "imminent." *See Lujan*, —— U.S. at ——, 112 S.Ct. at 2136. Our review of the pertinent authorities satisfies us that the proposed second amended complaint alleges particularized *future* economic injury sufficient to support Article III standing.

In *Rental Hous. Ass'n of Greater Lynn v. Hills*, 548 F.2d 388 (1st Cir.1977), the Department of Housing and Urban Development (HUD) approved funding to convert factories into housing for the elderly. While the project was still in process, an association of local landlords brought suit in federal district court, complaining that the grant contravened Section 8 of the Housing and Community Development Act of 1974, and threatened "competitive injury" to the plaintiff association's members, who "will lose tenants to the new project." *Id.* at 389. Finding the "competitive injury" allegations sufficient to survive a motion to dismiss, we stated:

> While the [ ] project is not yet completed, and hence *specific proof* of competitive injury is not possible, it could hardly be thought that administrative action likely to cause harm cannot be challenged until it is too late. We see *no insurmountable obstacles to proof* of the likelihood that [plaintiff's] members will lose tenants to the [ ] project.

*Id.* (citation omitted) (emphasis added). We noted that many cases uphold "competitor standing" based on "unadorned allegations" of latent economic injury. *Id.* at 390; *see, e.g., Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152, 154, 90 S.Ct. 827, 829, 830, 25 L.Ed.2d 184 (1970) (sellers of data processing services "no doubt" had standing to test ruling allowing national banks to sell data processing services; injury-in-fact element met by allegations that competition from national banks "might entail some future loss of profits" and that respondent bank was preparing to perform data processing services for two of plaintiffs' customers); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 45–46, 91 S.Ct. 158, 159, 27 L.Ed.2d 179 (1970) (holding that travel agents had "competitor standing" to test ruling allowing national banks to provide travel services); *Investment Co. Inst. v. Camp*, 401 U.S. 617, 620–21, 91 S.Ct. 1091, 1093–94, 28 L.Ed.2d 367 (1971) (finding "competitor standing," on the part of investment companies, to test a regulatory ruling authorizing national banks to operate collective investment funds).[13]

---

13. *See also, e.g., Associated Gas Distribs. v. Federal Energy Regulatory Comm'n*, 899 F.2d 1250, 1258 (D.C.Cir.1990) (holding that, even if no "specific instances of existing competition" had been asserted, FERC's decision authorizes transportation and sale of gas which "threaten AGD's members competitively, because AGD's members include local distribution companies who *may lose* business to allegedly illegal transactions") (emphasis added); *Securities Indus. Ass'n v. Clarke*, 885 F.2d 1034, 1038 (2d Cir.1989) (securities dealers sufficiently alleged competitive injury-in-fact for "standing" to test regulatory ruling allowing banks to sell mortgage pass-through certificates), *cert denied*, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1021 (1990); *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir.1988) (film distributors and exporters alleged sufficient injury-in-fact to test custom duties that "put[ ] their films at a competitive disadvantage in the international marketplace...., [a]lthough plaintiffs did not produce evidence that the payment of custom duties ... caused decreased sales or profits"); *National Coal Ass'n v. Hodel*, 825 F.2d 523, 526 (D.C.Cir.1987) (holding that Secretary of Interior's decision to allow land exchange so that plaintiff's competitor could mine "a large tract of previously unmineable land ... *undoubtedly* satisf[ies] constitutional standing requirements") (emphasis added); *Investment Co. Inst. and Securities Indus. Ass'n v. Federal Deposit Ins. Corp.*, 815 F.2d 1540, 1543 (D.C.Cir.) (holding that FDIC ruling allowing insured nonmember banks to enter securities field will deal petitioners, who represent mutual fund companies and investment bankers, a "competitive injury"), *cert denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987); *Sea–Land Serv., Inc. v. Dole*, 723 F.2d 975, 977 (D.C.Cir.1983) (concluding that plaintiff, which operated vessels on nonsubsidized trade routes, had alleged sufficient "competitive harm" to test a decision by Department of Transportation allowing subsidized carrier to call on ports off its subsidized route), *cert. denied*, 469 U.S. 824, 105 S.Ct. 103, 83 L.Ed.2d 47 (1984); *Peoples Gas, Light & Coke Co. v. U.S. Postal Serv.*, 658 F.2d 1182, 1194 & n. 9 (7th Cir.1981) (finding that plaintiff, a gas company, which alleged "a loss of future revenue" from postal service's plan to install electric instead of gas system, had suffered a non-"speculative" competitive injury; judicial invalidation of first bidding procedure "offer[s] at least a likelihood" that plaintiff, a potential bidder, would ultimately be awarded the government contract); *P.A.M. News Corp. v. Hardin*, 440 F.2d 255, 257 (D.C.Cir.1971) (concluding that plaintiff alleged competitive injury from Department of Agriculture's decision to allow free access to agricultural data, since plaintiffs previously compiled and sold information to public); *cf. Simmons v. Interstate Commerce*

The proposed second amended complaint meets the benchmark for "competitor standing" established by these authorities. The *Camp* triad and *Rental Housing* cases are all premised on a plaintiff's *status* as a *direct competitor* whose position in the relevant marketplace would be affected adversely by the challenged governmental action. *Cf. Energy Transp. Group, Inc. v. Maritime Admin.*, 956 F.2d 1206, 1215 (D.C.Cir.1992) (finding that a disgruntled contract bidder, although *generally* engaged in the fuel transportation business, failed to allege sufficient "competitive injury" where it could not presently, or within prescribed future period, perform the particular types of services required by the contract at issue). The Supreme Court found "competitor standing" in the *Camp* cases based on an alleged potential for heightened competition in a *national* marketplace. Thus, arguably at least, the *narrower* the relevant marketplace, as in *Rental Housing* (municipality) and here (state), the greater the likelihood that a plaintiff will experience future economic loss as a consequence of the competitive advantage bestowed on its direct competitor. In some "direct competitor" cases, future injury-in-fact is viewed as "obvious" since government action that removes or eases only the competitive burdens on the plaintiff's *rivals* plainly disadvantages the plaintiff's competitive position in the relevant marketplace. However, "[w]here 'injury' and 'cause' are *not obvious*, the plaintiff must plead their existence in his complaint with a fair degree of specificity." *Munoz–Mendoza*, 711 F.2d at 425 (emphasis added).

There can be no question but that out-of-state milk producers are in direct competition with Massachusetts milk producers. At the very least, out-of-state producers have to defend their current 90% share of the Massachusetts milk market and may even elect to compete with Massachusetts producers for

the remaining 10% market share.[14] If, as alleged, *see supra* pp. 919–920, Massachusetts producers were to realize sufficient infusions of capital to increase their milk production and their Massachusetts market share, it is "obvious" that appellants would sustain direct economic harm commensurate with the diminution of their current market share.

Even assuming, however, for discussion purposes, that the causal nexus between the challenged pricing order and appellants' alleged competitive injury is not sufficiently "obvious," we are not persuaded by the Commissioner's contention that the sequence of economic events projected in the second amended complaint is too conclusory, speculative or attenuated. *See, e.g., United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 912 (D.C.Cir.1989) ("When considering any chain of allegations for standing purposes, we may reject as overly speculative ... predictions of future events (especially *future actions by third parties*)....") (emphasis added), *cert. denied*, 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990). In order to demonstrate "standing," "pleadings must be something more than an ingenious academic exercise in the conceivable"; a plaintiff may not simply assert "that he can imagine circumstances in which he could be affected by the agency's action." *SCRAP*, 412 U.S. at 689, 93 S.Ct. at 2416. The more remote in time the alleged injury-in-fact, the less obvious the "concreteness of the controversy." Thus, where the complaint relies only on prospective harm, it " 'must demonstrate a realistic danger of sustaining a direct injury.' " *United Transp. Union*, 891 F.2d at 913. On the other hand, "competitor standing" cases *necessarily* turn on *degrees of probability, see Mount Wilson FM Broadcasters, Inc. v. Federal Communications Comm'n*, 884 F.2d 1462, 1465

*Comm'n*, 900 F.2d 1023, 1026 (7th Cir.1990) (holding that rival shippers alleged sufficient injury-in-fact to contest ICC decision to permit abandonment of rail line, where plaintiffs' competitor's line remains open, although injury was not ultimately redressable by judicial action), *cert. denied*, 499 U.S. 919, 111 S.Ct. 1308, 113 L.Ed.2d 242 (1991).

14. The Commissioner points out that appellants do not allege that they can increase their future milk production so as to displace the Massachusetts producers from their current 10% market share. Even assuming that this omission undermines their claimed "injury-in-fact" with respect to the 10% share, there is no requirement that a plaintiff plead *multiple* forms of future injury-in-fact.

(D.C.Cir.1989) ("If an[ ] agency's act creates 'a substantial probability' of an 'injury in fact,' the causation requirement of Article III is satisfied.") (quoting *Warth*, 422 U.S. at 504, 95 S.Ct. at 2208), a measurement "not easily susceptible to concrete definitions or mechanical application," *AVX*, 962 F.2d at 113.

All predictions are conjectural to a degree. Somewhere along the spectrum of probability, between tomorrow's sunrise and "unadorned speculation," *see, e.g., Diamond v. Charles*, 476 U.S. 54, 66, 106 S.Ct. 1697, 1705, 90 L.Ed.2d 48 (1986) (pediatrician's allegations of injury-in-fact based on assertion that aborted fetuses might otherwise have become fee-paying patients), lie appellants' allegations of "imminent" injury-in-fact based on the laws of economics. Economics is a cross between an art and a science, which is to say, both an imperfect art and an imperfect science. While the law of supply and demand may sometimes be suspended by unpredictable marketplace decisions, and even lesser fortuities like bovine obstinacy, basic economic theory quite consistently transcends utter randomness by positing elemental laws of cause and effect predicated on actual market experience and *probable* market behavior. Indeed, most "competitor standing" cases depend on such core economic postulates. *See United Transp. Union*, 891 F.2d at 913 (noting that in "garden variety competitor standing cases," courts routinely credit causal connections "firmly rooted in the basic laws of economics" or "basic economic logic"); *see also American Soc'y of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 157 (D.C.Cir.1977) ("[A]ll claims of competitive injury are to some extent speculative [and] predicated on the independent decisions of third parties, i.e. customers. However, economics is the science of predicting these economic decisions....") (Bazelon, J., dissenting), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978).

In *Rental Housing*, we credited at face value an allegation that the plaintiff landlords, representing slightly more than one-third of the renters in the relevant housing market, would "lose tenants" to the HUD-subsidized project, even though their economic prediction plainly depended on the decisions of any number of independent parties—*inter alia*, elderly tenants seeking suitable housing, local zoning and planning boards, other federal and state agencies, and lending institutions—not to mention less predictable factors such as disasters, *e.g.*, fire. Two rational economic assumptions nonetheless combined to make it sufficiently "probable" that the landlords would sustain "concrete" future injury: by increasing the volume of available housing in a defined market, both consumer demand and prices were likely to fall. Similar economic principles impelled the *Camp* triad decisions on "competitor standing." *See also supra* note 13.

The second amended complaint, much like that in *Rental Housing*, is based on standard principles of "supply and demand" routinely credited by courts in a variety of contexts. *See, e.g., Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 590, 103 S.Ct. 1365, 1374, 75 L.Ed.2d 295 (1983) (price or sales tax increase "presumably will cause a decrease in demand" for product) (citing Paul A. Samuelson, Economics 381–83, 389–90 (10th ed. 1976)); *Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 125 (D.C.Cir.1990) ("Since the demand for a product is decreased as its price is increased...."); *Alcan Sales, Div. of Alcan Aluminum Corp. v. United States*, 693 F.2d 1089, 1092 (Fed.Cir.1982) (nonrefundable federal surcharges are likely to be more effective in decreasing demand for imported goods because importers are more likely "to pass along the cost of the surcharge through to consumers...."), *cert. denied*, 461 U.S. 943, 103 S.Ct. 2119, 77 L.Ed.2d 1300 (1983). In the present case, the more industry-specific allegations—such as Massachusetts dealers' preference for indigenous milk supplies—are confirmed by the affidavit of Dr. Ronald Knutson, a national expert in dairy industry economics, *see supra* pp. 919–920. We conclude, therefore, that rather than "empirically unverifiable" conclusions, *see Dartmouth Review*, 889 F.2d at 16, the economic "facts" alleged in the proposed second amended complaint set forth adequate grounds to demonstrate, *at the pleading stage*, a sufficient likelihood that the chal-

lenged pricing order will result in reduced out-of-state milk sales to Massachusetts dealers at lower prices.

Even assuming that out-of-state producers, *as a class,* might be injured under appellants' forecasts, the Commissioner contends that these *individual* appellants failed to demonstrate either injury-in-fact or that West Lynn Creamery will buy less than 100% of their milk production in the event Massachusetts production is increased in the future. Once again, we cannot agree. Like other Massachusetts dealers with whom it must compete, West Lynn's self-interest (in lower transportation costs and reduced perishability) will be served by purchasing milk from nearby producers, which at least in many, perhaps most, cases will be producers located in Massachusetts. In that eventuality, the out-of-state producers' current 97% share of West Lynn's milk business would decline. Nor is there anything in the appellate record to suggest that West Lynn has a *non-economic* motive to spare these individual appellants at the expense of other out-of-state producers. Furthermore, even if the alleged reductions in out-of-state milk purchases were minimal at the outset, appellants would no longer be able to command as high a *premium* for their milk, because they would then have to compete with other out-of-state producers to supply a diminished share of West Lynn's import needs. Finally, as out-of-state milk is displaced in the Massachusetts marketplace and "overflows" into interstate commerce, the federal blend price will deflate, lowering the "safety net" for all milk producers including appellants. For these reasons, we cannot agree with the conclusion that the federal "blend" price insulates appellants from all cognizable injury-in-fact, *see supra* p. 919, or renders inconsequential all other alleged injury-in-fact (*e.g.,* loss of premium paid out-of-state producers prior to pricing order).

Similarly, the Commissioner cannot carry the day on the claim that appellants' injury-in-fact is shared with so large a class (all out-of-state producers selling to Massachusetts dealers) that their respective shares of the aggregate injury will be minimal. "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *SCRAP,* 412 U.S. at 687, 93 S.Ct. at 2416; *see also AVX,* 962 F.2d at 113 ("While the requisite injury may be common to many, it may not be shared by all.") (citations omitted). Even if appellants' market "displacement" estimates were grossly exaggerated, a relatively small economic loss—even an "identifiable trifle"—is enough to confer standing, as it affords a constitutionally cognizable stake sufficient to ensure their vigorous prosecution of the litigation. *See Rental Hous. Ass'n,* 548 F.2d at 389 (although plaintiffs collectively owned 7000 of 18,000 rental units in relevant marketplace, and HUD–subsidized competitor would develop only 183 units, "the injury required for standing need not be substantial, *it need only exist*") (emphasis added).

Nor can the Commissioner sustain the dismissal on the ground that significant increases in Massachusetts milk production may be slow to materialize. The meaning of the term "imminent" depends on the particular circumstances, and in the highly competitive environment of the dairy industry, governmental actions often have intractable, long-term consequences. Particularly apt here is our earlier observation in *Rental Housing:* "it could hardly be thought that [State] action likely to cause harm cannot be challenged until it is too late." *Rental Hous. Ass'n,* 548 F.2d at 389. Although the "emergency" pricing order protected Massachusetts milk producers from immediate erosion of their remaining 10% share of the Massachusetts milk market by out-of-state producers, an actual increase in Massachusetts milk production may take months or even years to materialize since it would depend upon long-term capital investments in dairy herd and farm expansions and infrastructure improvements. Once realized, however, the Massachusetts producers' newfound competitive edge would likely continue for an extended period. *See, e.g., Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 675 (5th Cir.) (plaintiff's challenge to government's acquisition of perpetual easement to wetlands area alleged sufficient non-speculative injury by projecting water shortage "some forty years in the future"), *cert. denied,* —— U.S. ——, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992).

We in no way suggest, of course, that the second amended complaint's portrayal of milk industry economics is beyond refutation either on summary judgment or at trial. *See SCRAP*, 412 U.S. at 689, 93 S.Ct. at 2416 (where plaintiff alleges a "perceptible harm," the defendant should move "for *summary judgment* on the standing issue and demonstrate[ ] to the District Court that the allegations were sham . . . .") (emphasis added); *see also Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir.1988) (holding that film distributor-exporters alleged sufficient injury-in-fact to challenge custom duties which allegedly "put[ ] their films at a competitive disadvantage in the international marketplace"; "[a]lthough plaintiffs did not produce evidence that the payment of custom duties . . . caused decreased sales or profits, at the summary judgment stage, a plaintiff's allegations need not be proven but merely provable"); *Citizens for Envtl. Quality v. United States*, 731 F.Supp. 970, 973 (D.Colo.1989) (noting that opposing party could refute "general rule in economics[ ] that price decreases with increasing supply," by explaining "in highly technical terms that local timber markets depart from the general economic rule . . . .").[15] As we noted in *Rental Housing*, at this stage of appellants' litigation, "[w]e see *no insurmountable obstacles to proof.*" *Rental Hous. Ass'n*, 548 F.2d at 389 (emphasis added).[16]

### III

### *CONCLUSION*

As the proposed second amended complaint was sufficient to survive the motion to dismiss based on lack of standing, the motion to amend was not futile and the order granting the motion to dismiss must be vacated.

*The judgment is vacated and the case is remanded for further proceedings consistent with this opinion.*

---

**15.** We think appellants were entitled, *at the pleading stage*, to presume that the milk industry would be subject to the basic economic laws at work in other competitive markets. *See supra* p. 919:

> The Supreme Court [in *Camp*] did not . . . require plaintiffs *to allege in their complaint* facts sufficient to refute every possible anomaly of the marketplace such as the existence of voluntary labor or ideologically committed consumers. The Court assumed the marketplace would function in a normal, predictable fashion, for to assume otherwise would be to foreclose the very possibility of ever satisfactorily alleging a competitive injury.

*American Soc'y*, 566 F.2d at 158 (emphasis added). We nonetheless recognize, of course, as did the district court, that the milk industry is subject to federal marketing orders. Consequently, where such economic anomalies are material, they may be tested at summary judgment.

**16.** We take no position respecting the merits of the Commerce Clause challenge, which implicates questions of interstate commerce "burdens" analytically distinct from the "injury-in-fact" determination that is central to standing. As noted above, the Supreme Court has decided to review the underlying Commerce Clause claim. *See West Lynn Creamery, Inc. v. Commissioner of Dep't of Food and Agric.*, 415 Mass. 8, 611 N.E.2d 239, cert. granted, —— U.S. ——, 114 S.Ct. 56, 126 L.Ed.2d 26 (1993).